**FILED**

AUG - 7 2008

Clerk, U.S. District and
Bankruptcy Courts

Roman P. Storzer (D.C. Bar 459878)
**STORZER & GREENE, P.L.L.C.**
1025 Connecticut Avenue, Northwest
Suite One Thousand
Washington, D.C. 20036
Phone: (202) 587-9766
Fax: (202) 315-3996

George R. Keys, Jr. (D.C. Bar 292722)
**JORDAN & KEYS, P.L.L.C.**
1400 16th Street, Northwest
Suite 710
Washington, D.C. 20036
Phone: (202) 483-8300

Eric Rassbach (D.C. Bar 493739)
**THE BECKET FUND FOR RELIGIOUS LIBERTY**
1350 Connecticut Avenue, Northwest
Suite 605
Washington, D.C. 20036
Phone: (202) 349-7200

*Attorneys for Plaintiff*

Case: 1:08-cv-01371
Assigned To : Robertson, James
Assign. Date : 8/7/2008
Description: Civil Rights-Non-Employ.

JURY ACTION

# UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

THIRD CHURCH OF CHRIST, SCIENTIST,
WASHINGTON, D.C.,
900 16TH STREET NW, WASHINGTON DC
20006

           Plaintiff,

      v.

DISTRICT OF COLUMBIA HISTORIC
PRESERVATION REVIEW BOARD,
801 NORTH CAPITOL STREET NE,
WASHINGTON, DC 20002, and

THE DISTRICT OF COLUMBIA,
1350 PENNSYLVANIA AVENUE NW
ROOM 310
WASHINGTON DC 20004

          Defendants.

Case No. _____

**COMPLAINT FOR INJUNCTIVE
AND DECLARATORY RELIEF
AND NOMINAL DAMAGES; AND
DEMAND FOR JURY TRIAL;
SUMMONS**

## COMPLAINT

Comes now the THIRD CHURCH OF CHRIST, SCIENTIST, WASHINGTON, D.C., by and through its attorneys, and for its Complaint states as follows:

## NATURE OF ACTION

1.      The Plaintiff, the Third Church of Christ, Scientist, Washington, D.C. (hereinafter the "Church"), brings this action to redress injuries caused by the Defendant's unlawful restrictions on the Plaintiff's use of its Church building. The Church's present building, widely criticized as the "most unfriendly and depressing piece of spiritual architecture" in the city, is wholly inadequate to serve the congregation and prevents the Church from engaging in religious activities motivated by its sincere beliefs. The Church seeks to replace this structure with a place of worship that will accommodate both its congregation and its religious needs. The Washington, D.C. Historic Preservation Review Board (hereinafter the "HPRB"), however, has designated the 37-year-old building as a historic landmark, preventing the Church from replacing its building and substantially burdening the Church's free exercise of its religion.

2.      Plaintiff alleges that the HPRB's historic landmark designation violates the First Amendment of the United States Constitution, the Religious Land Use and Institutionalized Persons Act of 2000, 42 U.S.C. § 2000cc *et seq.* (hereinafter "RLUIPA"), and the Religious Freedom Restoration Act, 42 U.S.C. § 2000bb *et seq.* (hereinafter "RFRA"), by substantially burdening the Church's religious exercise without a compelling governmental interest.

3.      Plaintiff seeks declaratory and injunctive relief under RLUIPA, RFRA, 42 U.S.C. § 1983 and the United States Constitution for injuries suffered as a result of Defendant's unlawful conduct. Plaintiff also seeks nominal damages, costs and attorneys fees.

## JURISDICTION AND VENUE

4.    This Court has jurisdiction over all federal claims in the Complaint as arising under the United States Constitution pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3) and (a)(4), and under 42 U.S.C. § 2000cc *et seq.*, which confers original jurisdiction on United States District Courts in suits to redress the deprivation of rights, privileges and immunities, as stated herein. This Court has jurisdiction over the request for declaratory relief pursuant to 28 U.S.C. §§ 2201 and 2202.

5.    Venue lies in this District pursuant to 28 U.S.C. § 1391. All Defendants and Plaintiff are located in this District. All events giving rise to this action occurred in this District.

## PARTIES

6.    At all times herein mentioned Plaintiff THIRD CHURCH OF CHRIST, SCIENTIST, WASHINGTON, D.C. was and is an incorporated church located in Washington, D.C. The Church has been located at 900 16th Street NW since 1971.

7.    Defendant DISTRICT OF COLUMBIA HISTORIC PRESERVATION REVIEW BOARD is an agency of the District of Columbia government, created and existing by virtue of the laws of the District of Columbia, and is empowered by the District to act through its officials. The HPRB is empowered by the District of Columbia to designate buildings within the District as historic landmarks. D.C. Code § 6-1103(c)(3) (2001 ed.).

8.    Defendant DISTRICT OF COLUMBIA is the Seat of the Government of the United States and a municipality organized under the Constitution and Laws of the United States.

## STATEMENT OF FACTS

<u>Third Church of Christ, Scientist and Its Religious Exercise</u>

9.    The Third Church of Christ, Scientist, Washington, D.C., is a religious corporation organized under the laws of the District of Columbia. It was founded in a house on Lafayette Square in Washington, D.C. in 1918, and has been located within six blocks of its original location during its entire existence.

10.    The Church's first service was held on March 24, 1918. It was incorporated on June 25, 1926.

11.    The Church's Mission Statement, which is part of its corporate bylaws, emphasizes the importance of its location:

> This Church ministers to the world of downtown Washington, D.C. and to those for whom the downtown is important to their lives. It strives to embrace the world of government and business, of hotels and offices, of residents, commuters, visitors, and those who make their home on District streets. This Church strives to demonstrate that prayer uplifts the health of all aspects of our community, including the health of city families and children, and the health of the government.

(Formally adopted by the Church's members in July 2000, reaffirming a statement of purpose espoused in membership documents as early as 1963). The Church thus located in this area specifically to cater to the needs of the people of downtown Washington, and moving out of this area would be incompatible with the Church's stated mission.

12.    For many years, the Church was located at 13th and L Streets, NW in the District of Columbia. In 1967, the Church moved out of its 13th Street location to prepare for building a new home on 16th and Eye Streets, NW. In 1971, the Church's congregation moved to the subject building.

13.     The subject building was constructed and financed by the membership of the Church on land leased from The First Church of Christ, Scientist, in Boston, Massachusetts (a body corporate in accordance with the laws of the Commonwealth of Massachusetts), pursuant to a Lease Agreement dated November 9, 1972.

14.     As described *infra*, the Church's place of worship was built in the "Brutalist" architectural style (hereinafter the "Brutalist building"). As one commentator has described it, Brutalism is "the celebration of concrete." The style has been the subject of much criticism:

> Critics argue that th[e] abstract nature of Brutalism makes the style unfriendly and uncommunicative, instead of being integrating and protective, as its proponents intended. For example, the location of the entrance of a Brutalist structure is rarely obvious to the visitor. Brutalism also is criticized as disregarding the social, historic, and architectural environment of its surroundings, making the introduction of such structures in existing developed areas appear starkly out of place and alien.

The Church's present building suffers from all of these problems.

15.     The designer of the new building, Araldo Cossutta, had never built a church before. Cossutta had little interaction with church members during the design phase of the building. When church members complained about the elements of his design, he told them that those elements would have to remain, as they were part of his "artistic vision."

16.     When Cossutta finished the building in 1971, it did not resemble a church.

17.     The building is a concrete octagonal tower. Its fortress-like façade features three massive, windowless, 60-feet high concrete walls.

18.     The door to the Church is hidden when one approaches the building. Instead, the door faces a plaza which is cut off from the street and which connects the Church with an office building.

19.    The Church contains a cavernous, disjointed auditorium that seats 400.

20.    The Church does not have a steeple. Instead, the church bells hang in two racks from a horizontal arm projecting from the side of the building.

21.    The Church has always found the Brutalist building inadequate to house its religious programs and its congregation. From the start, as Church records demonstrate, in 1965, members wanted a "useful, practical building rather than a prestigious structure." The current structure makes it difficult for the Church to follow the Scriptural foundation of its worship:

> For I was hungered, and ye gave me meat: I was thirsty, and ye gave me drink: I was a stranger, and ye took me in: . . . And the King shall answer and say unto them, Verily I say unto you, Inasmuch as ye have done it unto one of the least of these my brethren, ye have done it unto me. (Matt. 25:31-46).

Third Church members believe that these verses mandate that their church building be a welcoming place that will attract prospective new members and permit ministering to the community.

22.    Instead, as the U.S. Commission of Fine Arts observed, the Brutalist building resembles a "war time bunker."

23.    The Brutalist building has failed the Church in its mission. The Church's auditorium was built to accommodate 400 people in a dark, broken-up and unfriendly atmosphere, whereas the Church currently draws approximately 40-60 Sunday worshippers.

24.    There are many facets of the Church's current building that prevent it from expressing its religious message, including:

(a)    The main entrance is hidden from nearly any direction from which one approaches the Brutalist building. This location conveys the erroneous impression that the Church is not open to strangers or newcomers;

(b)    The massive exterior walls, with no windows or doors on the sides facing the streets and sidewalks, give a forbidding appearance to passersby;

(c)    The plaza terminates in a high, gray, plain, vertical reinforced concrete wall;

(d)    The walkways in the plaza in front of the church, and the plaza design itself, direct eye and foot traffic to the office building across the plaza from the church, and away from the church;

(e)    The cavernous auditorium, which seats 400, is 250 more than needed. It presents a dark, enclosed environment served by only two skylights and one window, which never give enough light to conduct a service, and depending on the time of day and position of the sun, may not provide any light;

(f)    The electric lighting, which fully covers the ceiling and must be used for services, further detracts from a feeling of communion with God.

25.    The Brutalist building is also deteriorating, which has caused a number of additional problems. Concrete is a porous material which allows water to penetrate its exterior surface. Water entering the concrete walls of the church has led to (1) poor insulation in the building, causing radical changes of temperature through loss of heat in the winter and loss of cooling in the summer; (2) a smell of dampness in the auditorium; and (3) deterioration and the eventual weakening of the entire structure. These problems negatively affect the Church's worship and other religious activities.

26.    In order to counteract the poor insulation and maintain a comfortable temperature setting, during the summer the building's HVAC systems must operate 24 hours a day, seven days a week. Even with such usage, temperatures and humidity are often uncomfortable for

congregants, staff and visitors. The constant HVAC usage has resulted in expensive heating and cooling bills and is environmentally irresponsible. These impacts are not in keeping with the requirements of the governing *Church Manual*, which states, "God requires wisdom, economy, and brotherly love to characterize all the proceedings of the members . . . ." (Article XXIV, Section 5, Manual of The Mother Church, The First Church of Christ, Scientist, in Boston, Massachusetts.

27.    Congregants and visitors entering the Brutalist building's auditorium experience the feeling of a dark and somber environment. The lack of natural lighting and the numerous electric lights on the ceiling create the perception of being in an artificially lit auditorium, not an atmosphere conducive to religious worship. Additionally, the dozens of lights on the two-story-high ceiling requires the Church to set up scaffolding each year simply to replace light bulbs, further interfering with Church worship.

28.    Independent of the negative effects imposed on the Church's religious exercise, the Church seeks to use its funds for the Church's mission, and not for the maintenance of a Brutalist building.

## Need to Replace the Brutalist Building

29.    Church members were so dissatisfied with the Brutalist building that they began looking for alternatives as early as the 1980s, only ten to fifteen years after it was built. However, the Church never considered moving from its location. As discussed *supra*, the Church had always resided within 6 blocks of its present location in order to fulfill its mission.

30.    In approximately 1985, the Church began negotiations with developers for redevelopment of the site, including the possible replacement of the Brutalist building. These plans nearly came to fruition. In 1991, however, a land-use organization called the "Committee

of 100 on the Federal City" (hereinafter "Committee of 100") filed an application to the HPRB to designate the 20-year old Brutalist building a landmark. As soon as the application was filed, the building became a "prospective landmark." Plaintiff opposed the application. In a series of communications, the Church asked that the application be withdrawn, and, initially, the applicants suggested that they would do so if the Plaintiff was opposed to the designation. Despite the Plaintiff's request, the application languished before the HPRB until recently.

31.    In 2005, negotiations began between The First Church of Christ, Scientist, in Boston, Massachusetts (hereinafter "The Mother Church") which owned the land underneath the Brutalist building as well as the rest of the lot on which the building stands, and ICG 16th Street Associates, LLC, a Delaware limited liability company (hereinafter "ICG"). On January 16, 2007, The Mother Church conveyed its interest in the land, subject to the lease with the Church, to ICG. The 2007 agreement permitted the Church to build an adequate place of worship on the property that would accommodate its congregation and religious exercise. ICG asked the HPRB to finally rule on the application, which had been pending since 1991.

32.    In December of 2007, over Plaintiff's objections that the landmarking would substantially burden its religious exercise, the HPRB designated the Brutalist building a historic landmark to be entered in the District of Columbia Inventory of Historic Sites (see *infra*).

33.    The immediate effect of the HPRB's decision is to force the Church into maintaining a religious stasis, unable to accommodate even its present religious needs.

The HPRB and the Legal Effect of the Landmark Designation

34.    The HPRB derives its power from The National Historic Preservation Act, which was enacted in 1966. It established the right for states and districts to create a Review Board which would have the authority to designate historic landmarks. Subsequently, the District of

Columbia passed the District of Columbia Historic Landmark and Historic District Preservation Act of 1978 (hereinafter the "Act"), enabling the formation of the HPRB, and codified as D.C. Code § 6-1101 (2001 ed.). Section 6-1103(c)(3) of the Act gives the HPRB the power to designate historic landmarks, and to enter them into the District of Columbia Inventory of Historic Places, also created by the Act.

35.    The HPRB has broad discretion to designate (or not designate) any structure as a historic landmark. Section 6-1103(c)(2) of the Act gives the HPRB the power to:

> Perform the functions and duties of a State Review Board as set forth in regulations issued pursuant to the National Historic Preservation Act of 1966.

These regulations were adopted as the Historic Preservation Regulations (hereinafter the "Regulations") Chapters 25 and 26, 10A DCMR (*Historic Preservation*) September 2002. The Regulations give the HPRB full discretion to designate any building as a historic landmark. 10A DCMR § 106.1.

36.    The Regulations have "criteria" for making the designation, but they are general and vague, and any building with even mild historic significance could satisfy the discretionary criteria. 10A DCMR § 201.1.

37.    The Regulations do not permit the HPRB to consider a religious owner's rights under RLUIPA, RFRA or the First Amendment in making the designation.

38.    During the process of designating the Brutalist building a historic landmark, the HPRB explicitly refused to consider the Church's rights under RLUIPA, RFRA or the First Amendment. Tersh Boasberg, the Chairman of the HPRB, stated at its hearing on December 6, 2007 that "the case is not about . . . a violation of the First Amendment or RLUIPA, the Religious Liberties and Institutionalized Persons Act." He further stated that "the act of

landmarking itself does not impinge on religious freedom" and "[i]t's not a First Amendment case."

39.    Chairman Boasberg is also a member of the Committee of 100, the private organization that filed the application to landmark the Brutalist building back in 1991.

40.    Upon information and belief, Chairman Boasberg was appointed a trustee of the Committee of 100 in 1993, and in 1996 he became Chairman of the Committee of 100.

41.    Chairman Boasberg did not recuse himself, offer to recuse himself, or mention his past and present relationship with the Committee of 100 during either the landmarking or demolition permit hearings before the HPRB.

42.    The Regulations do not include a minimum age for the designation of any building. By contrast, the federal rules for the National Register of Historic Places, created by the 1966 National Historic Preservation Act, require that a building be at least 50 years old before it is included in the National Register.

43.    The Act calls for the creation of a 9-member panel that votes on applications for landmark designations.

44.    The Regulations also delineate how the HPRB decides which buildings it will designate as historic landmarks. Section 203.1 of the Regulations states the following:

> Application for designation of a property as a historic landmark or historic district shall be made only by the owner of the property, the Board, a public agency, governmental unit or department, Advisory Neighborhood Commission, or a historic preservation organization.

This provision allows many different types of organizations or agencies to apply to designate another entity's property as a landmark. Section 208.2 of the Regulations explains the effect of filing an application with the HPRB:

> When the staff has completed the official filing, the application is considered a pending application, and if the property is a proposed historic landmark, it is protected by the Act.

Thus, the mere filing of an application to create a historic landmark gives the building in question "protected" status.

45.     Sections 203.1 and 208.2 therefore permit virtually any organization to decide that a property should be protected under the Act, and then file an application with the HPRB, thereby automatically preventing certain changes to the property, including demolition.

46.     Here, the Brutalist building's "proposed landmark" status lasted for 16 years, during which time the Church was forced (after the resulting collapse of the 1991 development plans) to pray in and pay for a structure that did not fulfill its religious needs. The HPRB did not decide on the application until December 2007.

47.     The HPRB's specific purpose in designating the Brutalist building a landmark was to prevent its demolition.

48.     The designation of the Brutalist building as a landmark prevents the Church from making any exterior alterations to the building—including demolition, subdivision, alteration, or even some types of minor repairs—without first obtaining a permit from the HPRB. D.C. Code §§ 6-1104(a), 6-1105(a) (2001 ed.).

49.     The HPRB meets once a month to decide on permit applications. It recommends to the District of Columbia's Mayor's Agent whether to deny a permit or to grant it. If the HPRB decides to recommend granting the permit, it sends the application to the District of Columbia Mayor's Agent, the representative designated by the Mayor to make permit determinations for landmark structures. If the HPRB decides to recommend denial of the permit, the building owner has the right to request a public hearing before the Mayor's Agent.

50.    Under D.C. Code § 6-1104(e), the Mayor's Agent may issue a demolition permit for a landmark structure if the permit is "necessary in the public interest" or the failure to issue a permit will result in an "unreasonable economic hardship" to the owner. "In the public interest" means: (i) a project deemed to have "special merit" by virtue of "exemplary architecture, specific features of land planning, or social or other benefits having a high priority for community services." § 6-1102 (11), D.C. Code (2001); or (ii) a project consistent with the stated purposes of the legislation at § 6-1101(b), D.C. Code (2001).

51.    Under applicable law, the Mayor's Agent does not consider RLUIPA, RFRA, or the First Amendment in his or her analysis.

52.    Even if the HPRB and Mayor's Agent chooses to recommend and grant a permit, the permit might authorize only minor work.   Moreover, because the Church wishes to raze its building, it is highly unlikely that it will be successful in doing so, especially in light of the fact that the HPRB itself just designated the building a landmark in December 2007.

53.    In fact, the Church did apply for a demolition permit, and the HPRB unanimously voted on July 24, 2008 to recommend denial of the Church's request to raze the Brutalist building.

54.    The HPRB's recommendation was based solely on the Church's landmarked status.

55.    Chairman Boasberg stated that the HPRB could not consider issues of religious freedom.   He stated that the Church could "challenge the landmarking in any court of your choice."

56.    The Historic Preservation Office (hereinafter the "HPO") enforces the landmark designations of the HPRB.   The HPO conducts property inspections to ensure that no

construction takes place on landmarked buildings. Violators are subject to significant fines and penalties, including a $2,000 civil infraction fine.

57.    The Church cannot raze or modify the exterior of the Brutalist building without being subject to such fines and penalties.

58.    The HPRB's stated interest in designating the Brutalist building as a landmark, as well as the additional hurdles forced upon the Church as part of any futile attempt to do so raze the building, have created a great hardship to the Church. Not only has the HPRB prevented the Church from replacing its place of worship, but the inability of the Church to obtain a demolition permit in a timely manner as a matter of right has frustrated the financing mechanism under the 2007 agreement with ICG. That agreement would enable the Church to continue its existence at the corner of 16th and Eye in a newly designed structure that satisfies its religious mission; it would also enhance the streetscape of the entire block in a manner respectful and complimentary to the 16th Street Historic District and L'Enfant Plan.

59.    The Defendants possess no compelling interest in burdening the Church's religious exercise.

60.    Designation of "historic" buildings is an aesthetic interest, and is not in furtherance of the public health and safety.

61.    Furthermore, even if a government may possess a compelling interest in preserving some historic structures such as Independence Hall in Philadelphia or the Old Stone House in Georgetown, this interest does not exist for the Church's Brutalist building.

62.    At the time the Church's building was erected, many observers expressed distaste for the design. Washington Post architecture critic Wolf von Eckardt, in an article titled "Rude, Brutal, Military, Uncivilized," called it "rude and disorderly, a brutal, uncivilized and

inappropriate intrusion on the approach to the White House." Subsequently, another Washington Post architecture critic, Ben Forgey, criticized it as "brooding, inward-looking."

63.    Significantly, in 1988 the U.S. Commission of Fine Arts stated that "there is little about [the building] that might characterize traditional religious enclosures. It is, after all, an auditorium not a sanctuary . . . . [It has] outstanding problems that are not easily resolved . . . the south side of the church conjures the very unfortunate but obvious image of a war time bunker."

64.    Recently, Washington Post Columnist Marc Fisher called the building "antagonistic to human spirituality" and "an example of a failed and arrogant architectural experiment." He describes it in the following way:

> Two blocks from the White House, there is a concrete fortress that looks like a top-secret government installation. Set back on a barren plaza frequented mainly by homeless men in search of a restroom, the building faces 16th Street NW with dirty, rough, blank walls. Amazingly, this building is a church—probably the city's most unfriendly and depressing piece of spiritual architecture. (Emphasis added.)

65.    Charles Paul Freund, columnist for The American Spectator, commented that "most people probably mistake [the building] for a fortress intended to protect the president's house against a tank assault. It's a largely windowless octagonal tower made of raw, weathered concrete, and it's surrounded by a sterile 'plaza' that seems to have been emptied to keep the line of fire clear."

66.    Architect Thomas L. Kerns wrote to the Historic Preservation Review Board to request that the church not be granted historic landmark status. He wrote, "the Third Church building is more of a static urban sculpture than a vibrant, active building. If we learned our lesson from the failed experiments of Urban Renewals in the 1960s, it is that cities do not benefit

from empty, lifeless spaces and that cities should not force owners to retain places that destroy its character and mission."

67.     Based on the discretionary judgment of a handful of appointed board members—a judgment not even shared by the architectural community at large—the HPRB is now forcing the Church to maintain "the city's most unfriendly and depressing piece of spiritual architecture" at the expense of the Church's religious exercise.

68.     HPRB member Denise Johnson, who voted to landmark the building, said, "You don't necessarily have to like it, but you can learn enough to have an appreciation for it."

69.     The harm to the Church in being forced to maintain the Brutalist building is immediate and severe.

70.     Upon information and belief, the substantial burden imposed upon the Church is imposed in a program or activity that receives Federal financial assistance.

71.     The substantial burden imposed upon the Church affects commerce among the several States.

72.     For the above reasons, the implementation of the HPRB's designation of the Brutalist building as a historic landmark should be enjoined in order to remove the substantial burden such designation places on the Church's religious exercise.

## COUNT I

**Violation of the Religious Land Use and Institutionalized Persons Act of 2000
"Substantial Burden on Religious Exercise"
(42 U.S.C. § 2000cc(a))**

73.     Paragraphs 1 through 72 are incorporated by reference as if set forth fully herein.

74.     Defendants have deprived and continue to deprive Plaintiff of its right to the free exercise of religion, as secured by the Religious Land Use and Institutionalized Persons Act, by

imposing and implementing a land use regulation that places a substantial burden on Plaintiff's religious exercise without a compelling governmental interest, and without using the least restrictive means of achieving any such interest.

## COUNT II

### Violation of the Religious Freedom Restoration Act
### (42 U.S.C.A § 2000bb)

75.    Paragraphs 1 through 74 are incorporated by reference as if set forth fully herein.

76.    Defendants have deprived and continues to deprive Plaintiff of its right to the free exercise of religion, as secured by the Religious Freedom Restoration Act, by imposing and implementing a land use regulation that places a substantial burden on Plaintiff's religious exercise without a compelling governmental interest, and without using the least restrictive means of achieving any such interest.

## COUNT III

### Violation of the United States Constitution
### Free Exercise of Religion: First Amendment
### (42 U.S.C. § 1983)

77.    Paragraphs 1 though 76 are incorporated by reference as if set forth fully herein.

78.    Defendants have deprived and continue to deprive Plaintiff of its free exercise of religion, as secured by the First Amendment to the United States Constitution, by substantially burdening Plaintiff's religious exercise without a compelling governmental interest.

### REQUEST FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court grant the following relief:

(a)    A declaration that the HPRB's action in landmarking the Brutalist building is illegal and unconstitutional on the ground that it places a substantial burden on the

Plaintiff's religious exercise without a compelling governmental interest, thereby violating the Free Exercise Clause of the First Amendment to the United States Constitution, the Religious Freedom Restoration Act, and the Religious Land Use and Institutionalized Persons Act of 2000;

(b)    A declaration that the landmarking process in the District of Columbia is illegal and unconstitutional on the ground that it fails to consider or apply the religious liberty protections afforded by the First Amendment, RLUIPA and RFRA;

(c)    A preliminary and permanent injunction ordering Defendants to rescind the landmark designation and preventing Defendant from illegally and unconstitutionally enforcing the Brutalist building's designation as a historic landmark, including, but not limited to, enjoining Defendant from applying its laws in a manner that substantially burdens Plaintiff's religious exercise, and enjoining Defendant from preventing Plaintiff's exercise of constitutional and statutory rights;

(d)    A preliminary and permanent injunction requiring the Defendants to consider and apply the First Amendment, RFRA and RLUIPA in future deliberations concerning applications affecting religious assemblies and institutions.

(e)    An award to Plaintiff of full costs and attorney's fees arising from the Defendants' illegal and unconstitutional actions;

(f)    An award of nominal damages; and

(g)    Such other and further relief as this Court may deem just and appropriate.

## DEMAND FOR JURY

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff hereby demands

a trial by jury in this action of all issues so triable.

Plaintiff respectfully submitted this 7th day of August, 2008.

**STORZER & GREENE, P.L.L.C.**

By: _____

Roman P. Storzer (D.C. Bar. 459878)
**STORZER & GREENE, P.L.L.C.**
1025 Connecticut Avenue, Northwest
Suite One Thousand
Washington, D.C. 20036
Phone: (202) 857-9766
Fax: (202) 315-3996

George R. Keys, Jr. (D.C. Bar 292722)
**JORDAN & KEYS, P.L.L.C.**
1400 16th Street, Northwest
Suite 710
Washington, D.C. 20036
Phone: (202) 483-8300

Eric Rassbach (D.C. Bar 493739)
**THE BECKET FUND FOR RELIGIOUS
    LIBERTY**
1350 Connecticut Avenue, Northwest
Suite 605
Washington, D.C. 20036
Phone: (202) 349-7200

*Attorneys for Plaintiff*

JS-44
(Rev.1/05 DC)

# CIVIL COVER SHEET

| I (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| Third Church of Christ, Scientist   1100| | D.C. Historic Preservation Review Board; District of Columbia |

(b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF   11001
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT _____
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED

(c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)

Roman Storzer, Storzer and Green, PLLC
1025 Connecticut Ave NW, Suite 1000
Washington, DC 20036
(202) 587-9766

Case: 1:08-cv-01371
Assigned To : Robertson, James
Assign. Date : 8/7/2008
Description: Civil Rights-Non-Employ.

JURY ACTION

## II. BASIS OF JURISDICTION
(PLACE AN x IN ONE BOX ONLY)

O  1 U.S. Government Plaintiff

⊙  3 Federal Question (U.S. Government Not a Party)

O  2 U.S. Government Defendant

O  4 Diversity (Indicate Citizenship of Parties in item III)

## III CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN x IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) FOR DIVERSITY CASES ONLY!

| | PTF | DFT | | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | O 1 | O 1 | Incorporated or Principal Place of Business in This State | O 4 | O 4 |
| Citizen of Another State | O 2 | O 2 | Incorporated and Principal Place of Business in Another State | O 5 | O 5 |
| Citizen or Subject of a Foreign Country | O 3 | O 3 | Foreign Nation | O 6 | O 6 |

## IV. CASE ASSIGNMENT AND NATURE OF SUIT
(Place a X in one category, A-N, that best represents your cause of action and one in a corresponding Nature of Suit)

| O A. Antitrust | O B. Personal Injury/ Malpractice | O C. Administrative Agency Review | O D. Temporary Restraining Order/Preliminary Injunction |
|---|---|---|---|
| ☐ 410 Antitrust | ☐ 310 Airplane  ☐ 315 Airplane Product Liability  ☐ 320 Assault, Libel & Slander  ☐ 330 Federal Employers Liability  ☐ 340 Marine  ☐ 345 Marine Product Liability  ☐ 350 Motor Vehicle  ☐ 355 Motor Vehicle Product Liability  ☐ 360 Other Personal Injury  ☐ 362 Medical Malpractice  ☐ 365 Product Liability  ☐ 368 Asbestos Product Liability | ☐ 151 Medicare Act  **Social Security:**  ☐ 861 HIA ((1395ff)  ☐ 862 Black Lung (923)  ☐ 863 DIWC/DIWW (405(g)  ☐ 864 SSID Title XVI  ☐ 865 RSI (405(g)  **Other Statutes**  ☐ 891 Agricultural Acts  ☐ 892 Economic Stabilization Act  ☐ 893 Environmental Matters  ☐ 894 Energy Allocation Act  ☐ 890 Other Statutory Actions (If Administrative Agency is Involved) | Any nature of suit from any category may be selected for this category of case assignment.  *(If Antitrust, then A governs)* |

| O E. General Civil (Other) | OR | O F. Pro Se General Civil |
|---|---|---|

| **Real Property** | **Bankruptcy** | **Forfeiture/Penalty** | ☐ 470 Racketeer Influenced & Corrupt Organizations |
|---|---|---|---|
| ☐ 210 Land Condemnation  ☐ 220 Foreclosure  ☐ 230 Rent, Lease & Ejectment  ☐ 240 Torts to Land  ☐ 245 Tort Product Liability  ☐ 290 All Other Real Property | ☐ 422 Appeal 28 USC 158  ☐ 423 Withdrawal 28 USC 157  **Prisoner Petitions**  ☐ 535 Death Penalty  ☐ 540 Mandamus & Other  ☐ 550 Civil Rights  ☐ 555 Prison Condition | ☐ 610 Agriculture  ☐ 620 Other Food &Drug  ☐ 625 Drug Related Seizure of Property 21 USC 881  ☐ 630 Liquor Laws  ☐ 640 RR & Truck  ☐ 650 Airline Regs  ☐ 660 Occupational Safety/Health  ☐ 690 Other | ☐ 480 Consumer Credit  ☐ 490 Cable/Satellite TV  ☐ 810 Selective Service  ☐ 850 Securities/Commodities/ Exchange  ☐ 875 Customer Challenge 12 USC 3410  ☐ 900 Appeal of fee determination under equal access to Justice  ☐ 950 Constitutionality of State Statutes  ☐ 890 Other Statutory Actions (if not administrative agency review or Privacy Act |
| **Personal Property**  ☐ 370 Other Fraud  ☐ 371 Truth in Lending  ☐ 380 Other Personal Property Damage  ☐ 385 Property Damage Product Liability | **Property Rights**  ☐ 820 Copyrights  ☐ 830 Patent  ☐ 840 Trademark  **Federal Tax Suits**  ☐ 870 Taxes (US plaintiff or defendant)  ☐ 871 IRS-Third Party 26 USC 7609 | **Other Statutes**  ☐ 400 State Reapportionment  ☐ 430 Banks & Banking  ☐ 450 Commerce/ICC Rates/etc.  ☐ 460 Deportation | |

(2)

| O **G. Habeas Corpus/ 2255** | O **H. Employment Discrimination** | O **I. FOIA/PRIVACY ACT** | O **J. Student Loan** |
|---|---|---|---|
| ☐ **530 Habeas Corpus-General**<br>☐ **510 Motion/Vacate Sentence** | ☐ **442 Civil Rights-Employment**<br>(criteria: race, gender/sex, national origin, discrimination, disability age, religion, retaliation)<br><br>*(If pro se, select this deck)* | ☐ **895 Freedom of Information Act**<br>☐ **890 Other Statutory Actions**<br>(if Privacy Act)<br><br><br>*(If pro se, select this deck)* | ☐ **152 Recovery of Defaulted Student Loans**<br>(excluding veterans) |

| O **K. Labor/ERISA (non-employment)** | O **L. Other Civil Rights (non-employment)** | O **M. Contract** | O **N. Three-Judge Court** |
|---|---|---|---|
| ☐ **710 Fair Labor Standards Act**<br>☐ **720 Labor/Mgmt. Relations**<br>☐ **730 Labor/Mgmt. Reporting & Disclosure Act**<br>☐ **740 Labor Railway Act**<br>☐ **790 Other Labor Litigation**<br>☐ **791 Empl. Ret. Inc. Security Act** | ☐ **441 Voting (if not Voting Rights Act)**<br>☐ **443 Housing/Accommodations**<br>☐ **444 Welfare**<br>☒ **440 Other Civil Rights**<br>☐ **445 American w/Disabilities-Employment**<br>☐ **446 Americans w/Disabilities-Other** | ☐ **110 Insurance**<br>☐ **120 Marine**<br>☐ **130 Miller Act**<br>☐ **140 Negotiable Instrument**<br>☐ **150 Recovery of Overpayment & Enforcement of Judgment**<br>☐ **153 Recovery of Overpayment of Veteran's Benefits**<br>☐ **160 Stockholder's Suits**<br>☐ **190 Other Contracts**<br>☐ **195 Contract Product Liability**<br>☐ **196 Franchise** | ☐ **441 Civil Rights-Voting**<br>(if Voting Rights Act) |

**V. ORIGIN**

O **1 Original Proceeding**   O **2 Removed from State Court**   O **3 Remanded from Appellate Court**   O **4 Reinstated or Reopened**   O **5 Transferred from another district (specify)**   O **6 Multi district Litigation**   O **7 Appeal to District Judge from Mag. Judge**

**VI. CAUSE OF ACTION (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)**
42. U.S.C. Sec. 2000bb et. seq.; 42 U.S.C. Sec. 2000cc et. seq.; 42 U.S.C. Sec 1983; First Amendment to the United States Constitution

**VII. REQUESTED IN COMPLAINT**   CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23   DEMAND $ Nominal   Check YES only if demanded in complaint
JURY DEMAND:   YES ☒   NO ☐

**VIII. RELATED CASE(S) IF ANY**   (See instruction)   YES ☐   NO ☒   If yes, please complete related case form.

DATE 8/7/08   SIGNATURE OF ATTORNEY OF RECORD

**INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44**
Authority for Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

I.     COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT  (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

III.    CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV.    CASE ASSIGNMENT AND NATURE OF SUIT:  The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of case.

VI.    CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII.   RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.