UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

```
THIRD CHURCH OF CHRIST,         :   Civil Action No. 08-1371
SCIENTIST, WASHINGTON, D.C.     :
                                :
            Plaintiff           :
                                :
v.                              :   April 7, 2009
                                :
DISTRICT OF COLUMBIA HISTORIC   :
PRESERVATION REVIEW BOARD,      :
et al.                          :
            Defendants          :   2:00 p.m.
. . . . . . . . . . . . . . . . :   . . . . . . . . . . . . .
```

TRANSCRIPT OF MOTIONS HEARING
BEFORE THE HONORABLE JAMES ROBERTSON
UNITED STATES DISTRICT JUDGE

APPEARANCES:

```
 For the Plaintiff:          ROMAN PAUL STORZER
                             STORZER & GREENE PLLC
                             1025 Connecticut Avenue, NW
                             Suite 1000
                             Washington , DC 20036
                             (202) 857-9766

                             AMY MYERS
                             WOMEN EMPOWERED AGAINST VIOLENCE
                             1111 16th Street, NW
                             Suite 200
                             Washington, D.C.  20036
                             (202) 280-6212

 For the Defendant           LEAH BROWNLEE TAYLOR
 District of Columbia        D.C. OFFICE OF THE ATTORNEY
 Historic Preservation           GENERAL
 Review Board:               3007 Tilden Street, N.W.
                             Pod P
                             Washington , DC 20008
                             (202) 724 -7854

 For the Defendant           Andrea C Ferster
 District of Columbia:       2121 Ward Court, NW
                             5th Floor
                             Washington , DC 20037
                             (202) 974-5421
```

```
For Amicus National Trust      SCOTT M. EDSON
for Historic Preservation:     MARK S. DAVIES
                               O'MELVENY & MYERS LLP
                               1625 Eye Street, NW
                               Washington , DC 20006
                               (202) 393-5300


Court Reporter:                REBECCA STONESTREET, RPR,CRR
                               Official Court Reporter
                               Room 6511, U.S. Courthouse
                               Washington, D.C. 20001
                               (202) 354-3249
```

Proceedings reported by machine shorthand, transcript produced
by computer-aided transcription.

**P R O C E E D I N G S**

1    COURTROOM CLERK:  This is civil action 08-1371, the

2  Third Church of Christ, Scientist, Washington D.C. versus the

3  District of Columbia Historic Preservation Review Board, et al.

4  For the plaintiffs we have Roman Storzer and Amy Myers, and for

5  the defendants, Leah Taylor, Andrea Ferster, Scott Edson, and

6  Elizabeth Merritt.

7    THE COURT:  The Third Church of Christ, Scientist

8  owns -- or doesn't, I guess, does not own a building at 16th and

9  H Street that has been called brutalist because of its concrete

10  style.  It entered into an agreement with I guess a development

11  company called ICG for a sale and leaseback of the property; ICG

12  and the church want to tear the building down and make other use

13  of the property.

14    But it seems that 17 years ago, the committee of 100

15  applied to designate it as a historic property, and the

16  application sat there for 16 or so years.  I don't know why that

17  happened.  Maybe I'll hear that in this argument.

18    ICG acquired the land, leases the building to the

19  church, and now the church wants permission to raze the building

20  so that the property can be developed for some other purpose.

21    There is a permit application that has been on file

22  with the District of Columbia for more than a year now, filed in

23  late January 2008.  The Historic Preservation Review Board

24  issued a non-binding recommendation in July that the permit to

1    raze the building be denied; statute requires a ruling by the

2    mayor's agent within 120 days after the hearing record is

3    closed, but I don't know whether the hearing record has been

4    closed yet.

5         And now the church has sued under the Religious Freedom

6    Restoration Act and the Religious Land Use and Institutionalized

7    Persons Act of 2000, and the free exercise clause of the

8    First Amendment.  The District moves to dismiss, on the grounds

9    first that the challenge is not ripe because the District hasn't

10   ruled on the permit - and I would certainly like to know when

11   that ruling can be expected or whether it's already overdue -

12   and on the ground that the facial constitutional challenges fail

13   as a matter of law.

14        It's an interesting case, it's got a lot of complicated

15   issues.  I'll be happy to hear argument from the movant, who is

16   going to be represented by whom?

17        MR. EDSON:  Your Honor, Scott Edson, Your Honor, to

18   appear for National Trust For Historic Preservation as

19   amicus curiae.

20        THE COURT:  All right.  But who's appearing for the

21   District?

22        MS. TAYLOR:  Good afternoon, Your Honor.  Leah Brownlee

23   Taylor on behalf of the District of Columbia, along with the

24   Historic Preservation Review Board.

25        THE COURT:  Okay.  Are you ready to proceed?

1          MS. TAYLOR:  Yes, I am, Your Honor.  One moment.

2          THE COURT:  All right.  I'll be happy to hear your

3     argument.

4          MS. TAYLOR:  Thank you.

5          Your Honor, the Third Church's complaint challenges the

6     District of Columbia's historic landmark designation under the

7     First Amendment, the Religious Freedom of Restoration Act, and

8     the Religious Land Use and Institutionalized Purposes (sic) Act.

9          The Historic Preservation Act, like many historic

10     preservation laws throughout this country, was created to

11     protect and preserve properties in the District of Columbia for

12     historical, cultural, and architectural purpose.  The plaintiff

13     claims that the Historic Preservation Act, along with its

14     implementing regulations, violate the First Amendment and the

15     two federal statutes that I just cited, but fail to proffer any

16     facts that would demonstrate that the church has been injured in

17     any way.

18          For that reason, Your Honor, we move on three grounds;

19     ripeness, abstention, and exhaustion of administrative remedies.

20     But the threshold question that the Court must decide is whether

21     or not the issue before the Court is ripe for consideration.

22          We urge this court to exercise *Prudential* discretion in

23     deciding that this claim is not in fact ripe for adjudication.

24     The fact is, Your Honor, the landmarking decision has become a

25     final agency action, but the effect of that landmark decision

1    has yet to be determined.  As the Court previously noted, there

2    is a raze permit application that is pending before the mayor's

3    agent.  There was a hearing in November 2008, and we anticipate

4    a decision shortly.

5              THE COURT:  Define shortly for me.

6              MS. TAYLOR:  Well, Your Honor, I simply can't speak as

7    to the --

8              THE COURT:  Is the record closed?

9              MS. TAYLOR:  I believe the record is closed,

10   Your Honor.

11             THE COURT:  As of the date of that hearing?

12             MS. TAYLOR:  There might have been additional

13   submissions after the hearing.  I would have to check the record

14   to confirm that.

15             THE COURT:  Because if the record was closed as of that

16   hearing, the 120 days was over at the end of March.

17             MS. TAYLOR:  That is true, Your Honor.  There is a

18   120-day time frame by which there has to be a finding with

19   respect to the application that is pending before it after

20   referral to the Historic Preservation Review Board.  As I

21   stated, we anticipate that there will be a decision shortly.  I

22   cannot speak to the exact time frame.

23             But essentially the claim that is now before the Court

24   could become moot tomorrow, the next day, the next week.  And

25   that's why, as I just stated, the effect of the landmark

1    decision is yet to be determined because there has not been a

2    ruling on the raze permit application that the plaintiff seeks.

3            And although the plaintiff has limited its challenge to

4    historic preservation designation alone, it's clear that that is

5    the real issue that the Court is confronted with.  The church

6    seeks to raze its building.  That's what this complaint is

7    about, nothing more, nothing less.  The historic designation

8    alone has not caused the church any injury.  If you look at the

9    facts that have been presented in the plaintiff's complaint,

10   it's clear that historic designation alone does not in and of

11   itself cause an injury or burden on religious exercise.

12           THE COURT:  Well, wait a minute.  I'm not following

13   this.  Historic designation alone doesn't cause it because you

14   can always get a permit to raze it working past the historic

15   designation process.  Right?

16           MS. TAYLOR:  Well, historic preservation is simply a

17   recognition that that property has historical, cultural, or

18   architectural significance.  It's a recognition.  Beyond that,

19   it --

20           THE COURT:  Well, sure.  But it erects all kinds of

21   roadblocks to what an owner can do to the property, doesn't it?

22           MS. TAYLOR:  Well, Your Honor, respectfully, what it

23   results in is a process --

24           THE COURT:  It burdens the property.  It would be like

25   putting a lis pendens on a piece of property, wouldn't it?

1        MS. TAYLOR:  No, it would not, Your Honor.

2   Respectfully, Your Honor, what landmark designation does is it

3   results in a process.  It doesn't prohibit moving to -- amending

4   the property or subdividing the property or altering the

5   property or razing the property or trying to replace the

6   building.  It does not prohibit those things.

7        What it does do is it ensures that there's a process by

8   which an applicant can apply to alter or modify or subdivide or

9   demolish that property.  And the law allows for that process.

10   The historic designation only results in process.  It's not a

11   prohibition on altering or modifying or demolishing one's

12   property; it simply provides for process.

13        And as the Court of Appeals has already ruled on this

14   issue in *Metropolitan Baptist Church*, that process alone is not

15   injury.  This very issue was dealt with with the Court of

16   Appeals, and when the plaintiff in that case also challenged the

17   landmark designation itself, the Court found that process is not

18   an injury.  The Court found that the issue was not ripe for

19   review.

20        Because the real question is, what is the effect of

21   that landmark designation?  Well, that effect has yet to be

22   determined.  If you can alter your property or you can modify

23   your property or if you can raze your property, then the issue

24   is moot.  You've essentially gotten the relief that you've

25   wanted.  You can dispose of your property in any way that you

1    choose to dispose it.  That has not happened yet.  Although the

2    plaintiff has sought to raze -- sought to apply or applied for a

3    raze permit, a determination has yet to be made on that permit

4    application.

5         So I respectfully disagree with the Court's analogy,

6    and I do believe that it only provides for process.

7         THE COURT:  You can't disagree with an analogy,

8    counsel.  It's only a process.  It's only an analogy.

9         MS. TAYLOR:  Well, taking the Court's point at hand, I

10   would like to at least address the alleged injuries that --

11        THE COURT:  I mean, there certainly is -- let's say

12   it's only a process, but in order to go through the process, the

13   church needs to hire counsel.  Right?  Spend money for counsel

14   to go through the process?

15        MS. TAYLOR:  Not necessarily.  You don't have to hire

16   counsel.

17        THE COURT:  No?  They can do it pro se?

18        MS. TAYLOR:  They don't have to hire counsel.  They

19   can.  They have.

20        THE COURT:  They should.  Okay.  Go on.

21        MS. TAYLOR:  Okay.  Well, I wanted to examine the

22   alleged injuries that are stated in the complaint.  I think that

23   that's important in the context of a ripeness argument; what are

24   the injuries that are alleged, are these abstract injuries or

25   are these concrete injuries.

1          Well, one of the injuries that plaintiffs assert is

2     that, well, the historic preservation designation prevents the

3     church from making exterior alterations.  As I just indicated to

4     the Court, that's simply not true.  The law says otherwise.  It

5     does not prevent alterations or modifications to a property, it

6     only ensures that there's a process.

7          Plaintiff also claims, well, with the landmark

8     designation we have to keep up our property, we have to maintain

9     our property.  Well, they would have to ordinarily maintain

10    their property anyway.  There are common law public nuisance

11    laws, there's regulatory laws that require a property owner to

12    maintain its property.

13         They also allege that, well, the historic preservation

14    designation and the Historic Preservation Act and the

15    implementing regulations don't consider a religious

16    institution's right to religious rights, and that in and of

17    itself is a hardship.  Well, in this case, Your Honor, it's

18    clear that the right that they seek to vindicate is the right to

19    raze their building.

20         They claim that there are economic hardships, and that

21    very issue is before the mayor's agent in a different forum.  So

22    there's certainly no injury in fact when they've in fact raised

23    those same arguments before the mayor's agent in a separate

24    forum.

25         So Your Honor, I say to you that the plaintiffs have

1   not proffered any facts which would demonstrate that there are

2   any injuries, or their injuries are in fact ripe, because there

3   has not been a determination with respect to their permit

4   application.

5          THE COURT:  This is a motion to dismiss, not a motion

6   for summary judgment.  Right?

7          MS. TAYLOR:  It is not a motion for summary judgment,

8   it is a motion to dismiss.  But --

9          THE COURT:  So they've alleged -- they've made

10  allegations about their burden.  Isn't that enough on a motion

11  to dismiss?

12         MS. TAYLOR:  No.  On a motion to dismiss, if a claim is

13  not ripe, it should be dismissed.  As I indicated to the Court

14  before, the *Metropolitan* --

15         THE COURT:  So you're saying they haven't shown any

16  facts?

17         MS. TAYLOR:  On a 12(b)(6) motion you have to proffer

18  facts that would afford you relief from the Court.  And they

19  simply haven't.  *Metropolitan Baptist Church* dealt -- the Court

20  of Appeals dealt with this same exact issue.

21         THE COURT:  The D.C. Court of Appeals?

22         MS. TAYLOR:  Yes.  Is historic designation, historic

23  landmarking, is that in and of itself an injury.  No, it is not.

24  That's how they ruled; they determined that it was not ripe.

25         And so I respectfully submit to the Court that the

1    claims before the Court are not ripe, because there just has not

2    been a determination as to the effect of the landmark

3    designation.

4            THE COURT:  Well, does there come a point in your

5    argument when the passage of time makes it ripe because the

6    historic -- whoever is supposed to decide this petition hasn't

7    decided it or won't decide it?

8            MS. TAYLOR:  Your Honor, I do believe that if there's

9    some evidence or allegation of some purposeful delay or some

10   hostility to the plaintiff for religious reasons, and that

11   there's a refusal to rule on those grounds, a refusal to issue a

12   decision on those grounds, it could lend itself to some sort of

13   argument.  That's not the argument that's been made by the

14   plaintiff in this complaint.  That's certainly not what we have

15   here.  We have a hearing that took place in November, late

16   November of 2008.  We're only in April.  You know, it takes time

17   to write a decision and order.

18           But I would like to also address a couple of other

19   issues with the Court, and the District of Columbia also moved

20   on grounds of abstention as well as exhaustion.  And they really

21   go to the ripeness issue, Your Honor, because it's our belief

22   that the Court should abstain from making a ruling on these

23   issues until there's been an opportunity to develop a full

24   factual record and a decision order with respect to the pending

25   permit application.

1          You know, as we noted in our papers, it's simply not

2     within the proper discretion of this court to essentially become

3     a super land use appeals court, deciding very complicated issues

4     of historic preservation and land use.  That role and that

5     function appropriately belongs with the local land use board, or

6     in this case the mayor's agent.  And until there has been a

7     ruling by the mayor's agent, we urge this court to abstain from

8     issuing a ruling.  Essentially plaintiff's as-applied challenge

9     could be rendered moot by a ruling by the mayor's agent.

10         THE COURT:  And if it's not?  If the mayor denies the

11    petition or the application, then do we have a justiciable

12    issue, in your view, on the as-applied challenge?

13         MS. TAYLOR:  Well, it's not my belief, and we've noted

14    this in our papers, that the restriction on property is

15    tantamount to a substantial burden on religious exercise.  We

16    believe that those are two separate issues.  But with respect to

17    ripeness --

18         THE COURT:  Well, look, the complaint in this case lays

19    it out pretty starkly.  It's a building that the church today

20    finds virtually unusable to carry out its own mission; the

21    entrance is in a lousy place, it's cold and dark, it's not

22    welcoming, it's not what the church wants, it's not what the

23    church believes is consistent with the church's mission.  Why is

24    it not a burden on the exercise of religion to tell the church

25    they have to keep the building the way it is?

1        MS. TAYLOR:  But Your Honor, I think it's important to

2   note that church members have been praying and congregating and

3   worshipping there for years.  This --

4        THE COURT:  Well, just as you don't want to make me a

5   land use expert, I don't want you to be an expert on worship.

6        MS. TAYLOR:  But this is a case involving the

7   First Amendment, RLUIPA, and RFRA, respectfully.  I mean, it

8   goes to the very heart --

9        THE COURT:  Yeah, and we're not going to tell Christian

10  Scientists or anybody else whether the way they want to worship

11  is the right way to worship.

12       MS. TAYLOR:  But they have not alleged that they have

13  not been able to worship.

14       THE COURT:  Oh, sure they have.  They've talked about

15  the mission of their church, they've talked about how nobody

16  wants to come in to that church.  Have you been to that church?

17       MS. TAYLOR:  I've been by the church, Your Honor.

18       THE COURT:  You've been by the church.  You haven't

19  exactly felt like you could even find the front door, have you,

20  much less wanted to walk in to it?

21       MS. TAYLOR:  Your Honor, it still has architectural

22  significance in the District of Columbia.

23       THE COURT:  I'm sure.

24       MS. TAYLOR:  You know, I certainly --

25       THE COURT:  Look, it's in the eye of the beholder,

1    counsel.  It's in the eye of the beholder.

2        MS. TAYLOR:  But Your Honor, the disposition of one's

3    property doesn't necessarily equate to restrictions on your

4    ability to engage in religious activity, and I respectfully --

5        THE COURT:  Well, that's your argument, but how do you

6    counter the assertion by the church that, yes, it does?  How can

7    you -- you're just arguing with the church about what they think

8    their mission is.  They win that argument every time.

9        MS. TAYLOR:  Well, I certainly don't want to go down

10   that road and get into disputes about whether or not they can

11   really exercise their religious freedom or exercise their

12   religion, because I understand their position and I take mine.

13       But I think with respect to the issue, the threshold

14   issue before the Court, this claim simply is not ripe, and I

15   think that that's what the Court needs to decide.

16       Going to the merits of the issue is something that

17   hopefully won't be decided in this forum.  But with respect to

18   ripeness and abstaining from issuing a ruling until the mayor's

19   agent has had an opportunity to decide and issue a decision with

20   respect to its raze permit application, granting the relief that

21   the Court indicates at least by some of its questioning it may

22   be inclined to grant, it's clear that the mayor's agent is

23   empowered to do exactly what the plaintiff is now asking this

24   court to do.

25       So we need to allow the District of Columbia to issue a

1    decision and issue a ruling with respect to that raze permit,

2    because this all could be moot.

3         Now, if by happenstance the mayor's agent decides to

4    deny the permit application, the plaintiff has other available

5    recourses that it can avail themselves of.  And that goes

6    exactly to the exhaustion argument; whereas they have applied

7    for a permit application, they have not fully exhausted their

8    administrative remedies.

9         THE COURT:  What's their remedy after denial?

10        MS. TAYLOR:  Superior Court.

11        THE COURT:  Are you going to tell me that they have to

12   go to Superior Court before they can come here?

13        MS. TAYLOR:  I'm not going to tell you that,

14   Your Honor.

15        THE COURT:  Are you going to argue that to me?

16        MS. TAYLOR:  I'm not going to argue that to you,

17   Your Honor.  I'm going to say that's an available route that

18   plaintiffs can take.  It's not up to me to tell --

19        THE COURT:  But does the District have a position now

20   as to whether exhaustion will have been accomplished if they're

21   denied, and they can then come to this court?  Or will the

22   District's position be that in order to exhaust, they have to go

23   to the D.C. Court of Appeals?

24        MS. TAYLOR:  Well, our position is that the District of

25   Columbia provides an administrative process and a judicial

1    process.  Okay?  With respect to the administrative process, it

2    would be exhausted if they get a decision from the mayor's

3    agent.  With respect to the judicial process, it would not be

4    exhausted until they go file an action with Superior Court.

5           THE COURT:  Right.  But your argument is exhaustion of

6    administrative remedies, not exhaustion of judicial remedies,

7    whatever that means.

8           MS. TAYLOR:  Well, exhaustion is exhaustion, whether

9    it's administrative or judicial.  There are available avenues

10   that the plaintiff can take before it needs to come to federal

11   court and claim that we've denied them process.  If we've

12   provided them administrative remedies, if we've provided them

13   that judicial process, then the District of Columbia has

14   provided and afforded plaintiffs the process that they're

15   entitled to to hear their claim or request for relief.

16          THE COURT:  Okay.

17          MS. TAYLOR:  And that simply has not happened yet,

18   Your Honor.

19          THE COURT:  All right.  Anything further?

20          MS. TAYLOR:  Well, I believe I've exhausted, no pun

21   intended, the *Metropolitan Baptist* case.  I've cited that to the

22   Court.  But I would just also like to note to the Court the

23   other cases that we've submitted in support of our motion to

24   dismiss, particularly the Second Circuit's opinion in *Murphy*,

25   the *St. Bartholomew's Church* case, which is actually, I think,

1     in my view, the most factually similar to the case before the

2     Court because it just involves the landmarking process and

3     whether or not that is in fact a violation of the free exercise

4     of religion clause.  And in that case the Southern District of

5     New York stated unequivocally that it was not.  In fact, it

6     noted that, "The mere possibility that the church may at some

7     time want to make a different use of its landmark property

8     creates no more than an incidental burden on the practice of

9     religion."  It does not -- "the designation of church buildings

10    as a landmark does not in and of itself violate the free

11    exercise clause."

12            THE COURT:  The St. Bart's case, I haven't actually

13    read that opinion, but I remember the case.  I think I remember

14    the case.  Am I not correct that St. Bart's was making that

15    argument more or less as a hypothetical argument, that they

16    didn't want the historic designation because they thought they

17    might want to do something else with the property some day?

18            MS. TAYLOR:  In the future, yes.

19            THE COURT:  But they didn't have a developer who had

20    bought the property, who had an active prospect for razing the

21    building, building something different on the spot.  They didn't

22    have a real deal on the table the way this church does.  Am I

23    right about that?

24            MS. TAYLOR:  I think the facts are a little different,

25    but I think legally the analysis is the same with respect to the

1    landmark designation in and of itself.

2          THE COURT:  Right.  Of course.  But as far as that

3    goes, as far as the landmark designation by itself is concerned,

4    I think you're on very solid ground.

5          MS. TAYLOR:  That's all this complaint is --

6          THE COURT:  But we have more happening here than just a

7    landmark designation, I think.

8          MS. TAYLOR:  Well, actually, Your Honor, plaintiff has

9    said this complaint is all about landmark designation.  It

10   doesn't go beyond that.

11         THE COURT:  Well, I know.

12         MS. TAYLOR:  Now, of course, they make reference to the

13   fact that they've applied for a raze permit and the mayor's

14   agent has yet to determine whether or not that will be granted,

15   but the plaintiff only challenges landmark designation.  That's

16   it.

17         THE COURT:  Well, let's hear from the plaintiff and

18   find out if his complaint really is that narrow.

19         Amicus, I'll hear from you after I hear from the

20   plaintiff.

21         MR. STORZER:  Thank you, Your Honor.  A little bit of

22   background.  The Court may not be aware, the church owns the

23   church building itself, and it leases the land under the

24   building from ICG, the developer.

25         THE COURT:  Okay.

1          MR. STORZER:  And their plans are not to sell the

2     property to ICG to build something else; they want to build

3     another church on this property, one that meets their religious

4     needs.

5          So in that respect, this case is much different from, I

6     think, all of the other cases cited by the defense.

7          THE COURT:  So what is ICG in this deal, just a

8     financing instrument?

9          MR. STORZER:  I think there's -- that's not my area of

10    representation of the client, but I believe that there is

11    something greater with respect to other property as well as a

12    financing instrument to be able to construct a new church.

13         But what the church is seeking in this action is the

14    ability to remove the landmark designation, which has a whole

15    host of other legal implications, despite what the Court has

16    heard already, on its ability to use and maintain its property,

17    and replace it -- eventually to be able to replace it with

18    another property.

19         One of the greatest challenges that the church is

20    facing right now is the mechanism by which they can replace

21    their structure is one that can evaporate at any time right now.

22    The developer has the ability to back out of the deal to do so.

23    If that answers the Court's question.

24         THE COURT:  Well, I'm a little confused now, because I

25    thought this was more of a traditional kind of a sale and

1    leaseback in which the developer owned everything on the

2    property.  And, as a practical matter, if the underlying

3    property is owned by the developer, I don't know what's in it

4    for the developer if the church is going to occupy all that land

5    with a new building, or if the church is going to build

6    something within a more commercial structure that the developer

7    wants to put on that building.

8            MR. STORZER:  No, Your Honor.  There's another

9    structure adjacent to this property that I believe the developer

10   is also involved in, but the subject of this action is simply

11   the church's building itself.

12           THE COURT:  All right.

13           MR. STORZER:  Right now the church is --

14           THE COURT:  So I don't have to worry about ICG?

15           MR. STORZER:  Only to the extent that one of the harms,

16   one of the several harms that the church is suffering, is the

17   inability to pursue this arrangement which would enable it to

18   build a structure that would accommodate its religious needs,

19   which involves ICG.

20           Right now the church is spending about 50 percent of

21   its operating budget, of its annual budget, on maintaining the

22   property itself.  Its projections say that in three years it's

23   going to be spending 100 percent of its budget on that

24   maintenance.

25           The church is suffering.  It's just had to -- I've

1    heard that it's just had to fire its organist and its soloist

2    because it simply cannot afford it.  It's putting most of its

3    money at this point into heating and maintaining the property

4    itself.  That's a little bit of the background.

5           With respect to ripeness, I think that's the central

6    issue here with respect to this motion.  The defendants rely on

7    the concept of *Prudential* standing, and I think it's important

8    at the outset to make clear that the *Prudential* principle of

9    standing applies only to the claim brought by the church under

10   the First Amendment.

11          Under both RLUIPA, Religious Land Use Act, and RFRA,

12   Religious Freedom of Restoration Act, both statutes contain an

13   explicit provision saying that "standing to assert a claim or

14   defense under this section shall be governed by the general

15   rules of standing under Article III of the constitution."  So

16   the analysis must be the typical three-part Article III standing

17   test, which is injury, causation, and redressability.

18          This is not unprecedented.  It's similar for the Fair

19   Housing Act, for example.  There are no *Prudential*

20   considerations when analyzing a Fair Housing Act claim.

21          The first part of the Article III standing test is the

22   one that's really at issue here:  Is there an injury in fact.

23   When you have an administrative action like this, the

24   Supreme Court has described what constitutes an injury.  An

25   administrative order is reviewable when it imposes a legal

1    obligation, takes away a legal right, or fixes some legal

2    relationship at the consummation of the -- at the end of the

3    administrative process.  There's no argument here that the

4    landmarking of the property has been completed.  There's nothing

5    further to do in the administrative sense.

6            THE COURT:  Would the church have had standing to

7    contest the landmarking of this building 17 years ago?

8            MR. STORZER:  Well, at that stage there would have

9    been --

10            THE COURT:  By the way, why didn't they?

11            MR. STORZER:  Pardon?

12            THE COURT:  Why didn't they object to this when it was

13    originally proposed 17 years ago?

14            MR. STORZER:  I was not around -- I'm not sure I had

15    finished law school 17 years ago, but my understanding is

16    that --

17            THE COURT:  You could have fooled me.  You're so

18    polished and experienced.

19            MR. STORZER:  My understanding is that that was the

20    beginning of the process, that the application had been filed

21    and it had to work its way through this process, which took

22    17 years, before there was a final agency decision.

23            THE COURT:  You don't look that old, of course.  You

24    just look polished and professional.

25            MR. STORZER:  The Court flatters me.

1          The District certainly would have argued there that the

2     finality was missing, although it did have certain ongoing

3     effects on what the church could have done as soon as the

4     application was filed.  That does implicate our facial challenge

5     to the ordinance or to the statutes at issue, but I was going to

6     address that afterwards.

7          The District really gives short shrift to what actually

8     happens when a building is landmarked.  It is not true that that

9     building is treated the same as any other building.  There are

10    greater legal requirements that a property owner has with

11    respect to maintaining a building, for example.  There are

12    requirements of waterproofing, there are requirements of weather

13    protection, various -- a whole litany of requirements that the

14    typical structure that is not landmarked is not subject to.

15         There are nuisance laws which require a certain level

16    of maintenance for any structure within the District, but those

17    requirements are much higher for a landmarked structure.

18         So the legal relationship between the church and the

19    District is altered as a result of the landmarking designation.

20    There is a legal obligation that is imposed upon the property

21    owner, under pain of fines and imprisonment if they fail to meet

22    these obligations.

23         And with respect to this particular property, the

24    obligations are particularly onerous because of the type of

25    structure we're dealing with here, the kind of bare concrete.

1    All of these issues of waterproofing become very important.  And

2    this is for a church whose congregation of maybe 60 people

3    simply are suffering under the economic burden of maintaining

4    the structure itself, much less improving it, improving a

5    structure that it does not want in the first place.

6         The District spends a lot of time talking about

7    process, that the landmarking is simply a recognition, and all

8    it does is create a process.  This process is -- it's not just a

9    process.  Even if there were not immediate harms happening here

10   to the church, the process that it would have to go to to do

11   something like to modify or to raze the building are nearly

12   impossible to meet.

13        What the church has to do under D.C. law is at the end

14   of the day demonstrate that if it's not able to raze the

15   building, the District would have effected a taking of the

16   property.  And it's my understanding that this standard has

17   never been met in all of the applications in the history of this

18   procedure, and has never been -- and such denials have never

19   been successfully challenged.

20        Not only that, but the process for demolishing a

21   typical structure is basically a ministerial one, a very minimal

22   one; the process of demolishing a landmark structure is all the

23   way at the other end of the spectrum.  As I said, it's basically

24   impossible.

25        The church is going through that procedure, and we hope

1   that someday we'll get a decision from the mayor's agent.  But

2   again, the harms that we're talking about here are happening

3   today.  They're not going to have an organist in a month because

4   of what's going on.  They may lose their contract with ICG

5   because of what's going on.

6          The harm to the congregation itself with respect to the

7   building is ongoing.  The Supreme Court has said that

8   deprivation of First Amendment rights even for minimal periods

9   of time constitutes irreparable injury, so every week that goes

10  by, every worship service that goes by.  And we understand that

11  out of the three worship services the church has per week, two

12  of them are going to soon be moved off site simply because the

13  church can't afford to maintain the property other than under

14  weekend service.  These harms are all ongoing.

15         THE COURT:  Look, I frankly don't have any problem with

16  the plaintiff's assertion of standing here.  I think there is a

17  very significant burden that's imposed on the church by

18  landmarking and by the ongoing need to keep up with the

19  standards required by landmarking, and by the obligation,

20  despite District counsel's assertion that you don't really need

21  lawyers, the obligation to retain polished, professional young

22  lawyers like yourself to represent them.  I don't have any

23  problem with standing.

24         I'm much more interested in ripeness because of the

25  pending administrative process, and in abstention because of

1   the -- I mean, I understand what the legal limits of abstention

2   are, but the sort of what deference, if any, is owed to the

3   District of Columbia process in carrying this matter forward

4   before we get to the constitutional questions and the statutory

5   questions.

6           What is your position on whether this record was closed

7   on November 25th, 2008; whether the 120 days required by the

8   statute have run, or I guess it's a regulation and not the

9   statute; what's going on with the application; when you can

10  expect an answer, and so forth?

11          MR. STORZER:  I believe that the record was closed

12  towards -- in January sometime.  I believe that there were some

13  additional submissions that were made to the mayor's agent, and

14  if the --

15          THE COURT:  That takes us some time into May?

16          MR. STORZER:  Yes, I believe that the 120-day period

17  would run into May.

18          Again, with respect to the raze permit application, the

19  ripeness of any challenge to that is not at issue because that

20  is not a claim that's being made at this point.  If the

21  application is denied, then we would move to amend the complaint

22  to include such facts and such claims.  That's simply not before

23  the Court.

24          That doesn't change -- as Your Honor said, doesn't

25  change the ongoing harm, current harm that exists as a result of

1    the landmarking itself.

2          THE COURT:  So District counsel is correct, you're not

3    bringing the razing application to me now.  All you want me to

4    do is to rule on the historic designation?

5          MR. STORZER:  The historic designation creates certain

6    legal obligations and takes away certain legal rights that the

7    church currently has with its ability to use, maintain the

8    property, as well as threatening its relationship to be able to

9    finance a new structure, and just the ongoing harm to the

10   congregation itself.

11         THE COURT:  Well, where was the church 16 years ago

12   when the application was made for historic designation?

13         MR. STORZER:  The church was waiting for that

14   application to be resolved.

15         THE COURT:  Did it intervene to oppose it?

16         MR. STORZER:  I believe that it did, and that it was --

17   the resolution was put off several times, and at some point

18   indefinitely.

19         Once again, without belaboring the point --

20         THE COURT:  When did you file this case?

21         MR. STORZER:  August 7th, I believe.

22         THE COURT:  Of 2008?

23         MR. STORZER:  Yes.

24         THE COURT:  18 months or so after the designation --

25   no, more than that.

1          MR. STORZER:  It's well within the statute of

2     limitations.

3          THE COURT:  No, I'm not concerned about the statute of

4     limitations.

5          MR. STORZER:  I believe that the decision was

6     December 2007.

7          THE COURT:  I'm talking about evidence and perception

8     of a burden.  It seems to me, just looking at this record, that

9     it wasn't until ICG got into the picture that anybody got

10     serious about this question.

11          MR. STORZER:  I believe the landmarking was

12     December 2007, so about eight months after that decision.  And I

13     know that ICG was involved prior to that point with respect to

14     the application before the HPRB.

15          THE COURT:  Okay.

16          MR. STORZER:  With respect to the precedent cited by

17     the District in support of its position, I think that what can

18     be taken away from looking at all of the cases that have

19     addressed this is that courts have -- there are no per se rules,

20     despite the description of the *Metropolitan Baptist* case, but

21     that these are very factual analyses.  The courts look at the

22     actual circumstances involved.

23          And under a *Prudential* standing analysis, because these

24     cases were brought under the First Amendment and other

25     constitutional protections, which doesn't exist for the RLUIPA

1    and RFRA claim, which specifically say it's Article III

2    standing, not *Prudential* standing, then under that *Prudential*

3    analysis, the Court looks at what's going on.

4            The closest case, the closest decision, by far, to the

5    instant case is the *First United Methodist Church of Seattle*

6    case, where you had a church whose church building was

7    landmarked.  These other cases involved apartment buildings or

8    row houses or other things that weren't the actual churches

9    involved.

10           In that case the Supreme Court of Washington said, as

11   this Court recognized, that landmark nomination alone carries

12   with it severe restrictions.  It's prohibited from making

13   alterations or significant changes to specific features or

14   characteristics of the site.  And importantly there, the Court

15   also noted that it hindered the church at issue from selling its

16   property.  So any financial arrangements it could make was

17   relevant to the Supreme Court of Washington there in determining

18   explicitly that the case, the landmark designation in itself,

19   was ripe for adjudication.

20           This Court in the *Weinberg vs. Barry* case held much the

21   same way, that designating the exterior of a building as a

22   landmark immediately and irreparably damaged plaintiffs by

23   depriving them of use and enjoyment of their property and

24   diminishing its value.  That's a 1985 decision.

25           The Court looked at the necessary -- the process that

1    was described by the District and understood that this was a

2    harm itself.  It stated, "The injury is allegedly affected or

3    threatened by the D.C. statute as applied because it subjects

4    alterations or modification of the building to the aesthetic

5    judgment of the joint committee and/or the review board, with

6    relief available only if, in the judgment of the mayor,

7    modification or alteration is necessary in the public interest,

8    or preclusion of such modification or alteration would result in

9    the imposition of undue economic hardship on the owner."

10           Again, these are the same facts that we're facing here,

11   and the issue is just as ripe here as it was in the *Weinberg*

12   case.

13           The *Metropolitan Baptist* case relied on principally by

14   the defendants talks about the Washington Supreme Court

15   decision, and distinguishes it from that case, which involved a

16   church who spoke, and I'm quoting from the opinion, "only in

17   general terms about their intentions to expand the facilities

18   currently available in certain row houses that were being

19   landmarked."  It was not the church building, they didn't have a

20   specific plan.

21           It's not like our church, where we have a very specific

22   plan to raze this building and construct one that is open to the

23   community, that fits the congregation, and that does not create

24   a crushing economic burden on its small congregation.

25           As I said before, also, the other cases cited by the

1    defendants in argument and in their briefs involve *Prudential*

2    standing, which is simply not an issue with respect to the

3    statutory claims.

4         The other cases are completely in opposite in terms of

5    their effects, where there was simply no application that was

6    ever filed or no final agency determination that was made, like

7    the *Murphy* case or the *Insomnia* case or the *Unity Ventures* case.

8         Again, you take away from this a very clear sense that

9    the courts that have analyzed these questions look at the

10   specific facts, look to see if there's a concrete plan, look to

11   see what the actual harm is of the church, and do not create any

12   per se rule saying that merely by the type of action it is, a

13   landmarking of a structure is never ripe for adjudication until

14   some further action is taken.

15        It would be like saying a prisoner can't challenge a

16   sentencing until an application for clemency is complete.  There

17   is a final decision, it does affect the legal rights of the

18   property owner, and the fact that some other administrative

19   process might alter that doesn't change the fact that there is

20   an injury in fact under Article III.

21        The Court mentioned abstention as an issue.  The

22   District raises both *Burford* and *Pullman* abstention in its

23   briefs, and takes the line from a line of cases talking about

24   federal courts being super land use boards.

25        This is not, of course, what we're seeking.  We're not

1    seeking review of the District's decision to landmark this, we

2    are seeking to enforce -- to have the Court enforce federal

3    statutory civil rights which Congress has given the courts

4    jurisdiction to review.  This is -- there are no -- with respect

5    to *Burford* abstention, the argument --

6         THE COURT:  Did you or your client make the argument

7    before the Historic Preservation Review Board that a negative

8    decision on the petition would burden your rights under either

9    RFRA or RLUIPA?

10         MR. STORZER:  Your Honor, this gets to not only the

11   as-applied challenge but also our facial challenge.  Both the

12   HPRB and the mayor's agent, who exist as officers of a

13   government that is a creature of federal law, have explicitly

14   stated that they will not be subject to such law, that they will

15   not apply those federal statutory protections of civil rights,

16   and that they will not take them into account in their analyses.

17   This is the District's position on this question.  We certainly

18   made the arguments, made them repeatedly, and were shot down at

19   every turn.

20         The chairman of the HPRB stated that the HPRB cannot

21   consider issues of religious freedom.  He said that if we have

22   such issues, we can take them to the court of our choice.  The

23   mayor's agent said that she did not have jurisdiction to decide

24   these matters, that they were outside of what her jurisdiction

25   was.  So the arguments were made, and not just rejected but

1    simply not analyzed at all.

2          We believe that that is subject to our facial

3    challenge, and certainly we're seeking declaratory relief that

4    such officers are subject to federal law as anybody else that

5    comes within the purview of the statutes is.  We cited a case

6    that came out of the Southern District of California that

7    explicitly held that the failure to consider such rights was an

8    element in supporting a finding of substantial burden on a

9    church's religious exercise.  That was the *Grace Church of North*

10   *County* case.

11         The defendants argue that we had -- in their briefs

12   they argued that both the HPRB and the mayor's agent could

13   receive such information; therefore, there was no problem.  The

14   fact that such information can be submitted as comments says

15   nothing about the fact that they refused to consider such

16   evidence in their deliberations.

17         THE COURT:  So I suppose your position would be that

18   even, even a grant of the petition to raze the building would

19   not moot your arguments?

20         MR. STORZER:  We have a claim for nominal damages, we

21   have a claim for declaratory relief.  With respect to seeking an

22   injunction to raze the building, an order permitting us to raze

23   the building would moot that issue.  Of course, that would most

24   likely be subject to an appeal by amicus or by other third

25   parties, so the issues would most likely still remain alive.

1          THE COURT:  Okay.

2          MR. STORZER:  Getting back to the abstention issues.

3          THE COURT:  Yeah.

4          MR. STORZER:  The courts - and I'm referring

5     specifically to the *Silverman vs. Barry* decision cited in our

6     briefs - holds that when you're dealing with federal civil

7     rights issues, or federal issues generally, quoting the Court,

8     "Federal courts routinely decide local matters of great

9     sensitivity, and we are not convinced that abstention from the

10    federal question case may be based on this rationale."

11         It doesn't -- *Burford* abstention simply doesn't apply

12    to federal legal questions.  There's no application in this

13    context.  It would mean that a federal court could never

14    adjudicate a RLUIPA claim, which by its own terms necessarily

15    involves local land use issues.  Any argument that by itself any

16    local land use case cannot be brought before a federal court

17    would eliminate the jurisdiction conferred by Congress.

18         *Pullman* abstention, which is the other type of

19    abstention raised by the District, deals with issues of

20    ambiguous state law.  And there is no question of unsettled

21    state law here.  Everybody agrees as to what the law says, what

22    the requirements are, that the standards are ambiguous, even

23    with respect to the facial challenge, where the District's

24    official policy is that it will not -- its officers will not

25    take into account RFRA or RLUIPA.

1          So in the absence of any unsettled question of state

2     law, there's absolutely no basis for applying *Pullman*

3     abstention, either.  These doctrines simply don't apply to the

4     present case.  The complaint only contains counts of federal

5     civil rights laws and no issue of state law.  We're not asking

6     this Court to resolve any issue of D.C. statutory or regulatory

7     law.

8          If the Court has nothing further...

9          THE COURT:  What happens if this motion to dismiss is

10    denied?  What's the next step?

11         MR. STORZER:  Well, timing wise, I guess as a practical

12    matter, if the mayor's agent abides by the deadlines set for her

13    decision, I assume that one of the next steps would be a

14    decision.  And if that decision was a granting of the permits,

15    then certainly my client will reevaluate its position in this

16    litigation.

17         If that decision is a denial, then we'll amend our

18    complaint and challenge, along with the landmarking, the denial

19    of the raze permit as well.  Otherwise, I assume that the case

20    would continue along its normal course.

21         THE COURT:  But what is the normal course of a case

22    like this?

23         MR. STORZER:  Well, I assume that the District will not

24    take the affirmative case that we have to demonstrate, that

25    there's a substantial burden on religious exercise, at face

1   value, and would seek discovery, as we would seek discovery on

2   its claims of compelling governmental interest.

3           This is a motion to dismiss.  We're at the beginning

4   stages of this litigation.  And I think that the Court --

5           THE COURT:  Yeah, but you can't diddle around with this

6   case for the years that this kind of litigation might take.

7   You're losing your organist.

8           MR. STORZER:  Absolutely.  Absolutely.  I don't think

9   that this is a complicated case.  The questions here I believe

10  are, for the most part, legal questions.  I don't think there

11  are great issues of material fact, maybe perhaps with respect to

12  how much this is actually costing the church to maintain this

13  property.

14          But the question at the end of the day is an important

15  one, and it pits two values that society has, two goods that we

16  protect, against each other.  One is the protection of religious

17  freedom and the other is the protection of architecturally

18  significant properties.  It's obviously our position that the

19  latter must bow to the former, but these, I believe, at the end

20  of the day are in great part legal questions and certainly ones

21  that would be ripe for summary judgment adjudication, not

22  several years down the road.

23          THE COURT:  All right.  Thank you, sir.  If amicus

24  wants to be heard, I'll hear you.

25          MR. EDSON:  Thank you, Your Honor.  I'll try to be

1   brief.  I guess I'll try to start with --

2           THE COURT:  I should probably disclose that I either am

3   or have been a dues-paying member of the National Trust For

4   Historic Preservation.  End of disclosure.  I don't think I have

5   a financial, aesthetic, religious, or other interest in this

6   case, but I think I should probably say that for the record.

7           MR. EDSON:  Okay.  Certainly.

8           THE COURT:  Because actually, I believe in historic

9   preservation.  I don't think anybody here doesn't.  But go on.

10          MR. EDSON:  Well, I think that's right, Your Honor.

11  And actually, I would like to sort of pick up on that point,

12  because I think what counsel said --

13          THE COURT:  Although I have to tell you a story about

14  it.

15          MR. EDSON:  Yes, Your Honor.

16          THE COURT:  You are in a brand new courthouse that is

17  next door to the ugliest public building in Washington D.C.

18  When they decided that they needed more space in this

19  courthouse, they learned, to their horror, that the courthouse

20  was a designated historic property and they couldn't change

21  anything of the fabric on the other side of that atrium out

22  there.  That is the reason why we have this big, essentially

23  useless, atrium between this building and that one, because the

24  atrium was necessary to preserve the fabric of the building next

25  door.

1          So historic preservation has its uses and its

2    frustrations.

3          MR. EDSON:  Absolutely, Your Honor.  And I think that

4    it's important, actually, to sort of pick up on that point and

5    to pick up on where counsel for the plaintiff ended.  When

6    viewed in the abstract, land use issues are always messy,

7    particularly when you have what are at least seemingly, on the

8    surface, competing interests at the outset.

9          The District of Columbia, like virtually every state

10   and local government from coast to coast, has a process for

11   dealing with that controversy and for working it out.  23 years

12   ago, in *Williamson County Regional Planning Commission vs.*

13   *Hamilton Bank of Johnson County*, which is cited at page 12 of

14   the amicus brief, the Supreme Court set down a virtually per se

15   rule that when you're going to challenge the application of a

16   local land use ordinance against you, you have to go first to

17   the local government and ask it, and -- you have to first take

18   advantage of the local process for doing what.

19          So in that case, that was a takings case, and they

20   said, even though you're -- in that case there was an

21   application for a plat to subdivide land, and they had gone and

22   they had applied for a subdivision and been denied because it

23   violated certain zoning ordinances.  And the Supreme Court said,

24   yeah, but you never sought a variance and you have to go seek a

25   variance first.

1          Now, in 2005, the Second Circuit in a case that's also

2     cited in our brief called *Murphy vs. New Milford Zoning*

3     *Commission* applied that to the RLUIPA context, and they again

4     said, if you're going to challenge the application of a local

5     land use rule under this statute, you've got to first go and

6     utilize the procedures in place by the local government and ask

7     them to either let you out of, or, in this case, you have to

8     seek a permit and you have to wait for the permit to be ruled

9     upon.  Now, that process --

10          THE COURT:  What if the local agency says, I'm sorry,

11     we don't do RLUIPA and we don't do RFRA?  We're not going to

12     entertain any of those arguments.  Then what?

13          MR. EDSON:  Well, Your Honor, there's, I think, two

14     parts of that question.  One is if they won't consider your

15     application.  If they won't consider your application at all,

16     then I think you could effectively consider it denied and go to

17     federal court.  But if they will consider your application, the

18     fact that they won't take a particular thing into account is not

19     ripe until you know at the end of the day whether you're going

20     to get what you want.

21          At the end of the day, I think it's important to

22     realize that the church may get every single thing it's asking

23     for in its complaint, and that at that point the stuff that

24     they're talking about will become effectively moot.

25          Now, in the meantime, they're asking the Court to

1    determine as a matter of federal law whether and to what extent

2    these statutes create particular procedural remedies that have

3    to be implemented by the District of Columbia at a particular

4    point in time.  And once federal courts get into that business

5    of deciding what procedures RLUIPA and RFRA decide, they're

6    going to have to put content into that, and that's going down a

7    very dangerous road.  And there's no reason why the Court should

8    get into that in this case, because this plaintiff may not need

9    it at the end of the day.

10       And I think paragraph 52 of their complaint is very

11   telling on that point.  Because what they say is, first, we --

12   although they say that the District might at the end of the day

13   partially grant them some leeway, but not a full permit, and

14   that it might not be everything they want, but it might.  And

15   then they also say they're not going to be happy with anything

16   short of a full raze permit anyway, but they might get that as

17   well.

18       So in the meantime, absent the resolution that this is

19   a futile or a sham process, I think the ripeness doctrine is

20   created.  And the Supreme Court was very clear in the

21   *Williamson County* case, that District Courts or U.S. federal

22   courts need to respect the local processes while they play

23   themselves out, until you get to a point in which the local

24   government has reached a determination of how they're going to

25   apply it to this property.

1          THE COURT:  Did the National Trust intervene as a party

2     or seek to intervene or appear amicus before the

3     Historic Preservation Review Board on this matter?

4          MR. EDSON:  No, Your Honor.  The National Trust has not

5     taken -- did not take a position at that point on the historic

6     merits of this process.  We do take a position that since the

7     District has now reached a determination that this is a historic

8     property, we do believe that that determination should be

9     respected and is entitled to respect.  But we did not take a

10    position at the designation stage on the historic merits of the

11    property.

12         THE COURT:  Okay.

13         MR. EDSON:  And if Your Honor has no further

14    questions...

15         THE COURT:  I don't think I have any further questions.

16    Thank you, sir.

17         MR. EDSON:  Thank you, Your Honor.

18         THE COURT:  Ms. Taylor, is it true that the Historic

19    Preservation Review Board and the mayor's agent have both said

20    they don't entertain arguments made under either RLUIPA or RFRA?

21         MS. TAYLOR:  Your Honor, I certainly wasn't present at

22    that hearing and certainly can't offer the Court any facts that

23    would substantiate those claims.  But I do know, as I pointed

24    out in my brief, that --

25         THE COURT:  It's more than a claim.  Counsel said it,

1    and I'll accept his representation.

2           MS. TAYLOR:  I understand.  But the claim is being made

3    to essentially buttress a facial challenge.  I mean, plaintiffs

4    basically claim that the Historic Preservation Act and

5    its implementing regulations don't allow for consideration of

6    First Amendment rights, RLUIPA rights, RFRA rights.  And when

7    you look at the laws on their face, as I noted in my brief, they

8    do allow for such consideration.  There's no restriction or

9    prohibition on the types of information that the

10   Historic Preservation Review Board can receive in deciding these

11   issues.

12          So with respect to the facial challenge, I do not

13   believe that plaintiffs have demonstrated that the laws

14   themselves substantially risk chilling the exercise of religion.

15   I believe that the laws do afford an applicant, an interested

16   property owner, the opportunity to put before the board its own

17   interests; in this case it was First Amendment, RLUIPA, RFRA.

18   Those arguments and those claims were addressed, apparently, to

19   the Historic Preservation Review Board.

20          So what goes into the decision making of the board

21   members I think is another issue, but the receipt of information

22   and the ability to develop a factual record on those issues

23   still remain intact.  The laws do provide for process and do

24   allow for the receipt of such information.

25          So if someone does have essentially a religious

1    accommodation or a request for a religious accommodation, our

2    laws certainly do provide for an applicant to make that request,

3    or at least bring that information to the attention to the

4    Historic Preservation Review Board.

5         But there are just a few things I would like to address

6    that counsel for the plaintiff raised, and I just want to make

7    sure that the record is clear, so when the Court does finally

8    consider or decide these issues, the Court has a clear

9    understanding of process here.

10        I just want to note for the record that plaintiffs did

11   consent to a stay of a decision on the landmark designation

12   application.  So I don't think that -- I think plaintiffs are

13   essentially estopped from challenging the number of years that

14   the landmark application protective status remained in fact,

15   because they consented to a stay of the designation.  So I just

16   wanted to bring that to the Court's attention.

17        I also want to note to the Court, as I indicated in my

18   briefs, historic preservation laws do allow for a process where

19   an applicant can either amend or move to revoke the landmark

20   designation.  That never happened here.  They were on notice

21   that the church was a protected landmark for years, for

22   17 years, and they never sought to, as far as I know, move to

23   amend or move to revoke that landmark designation.

24        And if this case is what plaintiffs claims it is, which

25   is a case involving a substantial burden on the free exercise of

1    religion, then, you know, I think it's noteworthy that they

2    failed to avail themselves of that administrative remedy that

3    our laws afford.  They simply failed to move to amend or move to

4    revoke designation.

5         There was also much discussion about injury and

6    Article III standing.  I would like to address plaintiff's

7    arguments with respect to financial injury.  Injury has to be

8    concrete; it cannot be abstract.  And I think it's noteworthy

9    that counsel said, well, the church may lose financing.  The

10   church has never stated that the loss of financing is imminent,

11   that there are no other means by which they can finance their

12   property, they have never alleged that ICG is the only company

13   that they can obtain financing through.  So I don't believe that

14   they have alleged a concrete injury with respect to finances.

15        There is also mention of the amount of upkeep and

16   maintenance that they are obligated to do with respect to the

17   church.  And I submit to the Court, and I said this before, that

18   it's no -- these requirements are no more onerous than what our

19   regulatory laws already provide for, or public nuisance laws or

20   common laws that require a property owner to upkeep its

21   property.  The standard, in fact, for the upkeep and maintenance

22   of historic property is demolition by neglect.

23        So I submit to the Court that it's no more onerous than

24   any other general requirements that a property owner would have.

25   In fact, it's higher, given that the standard is demolition by

1    neglect.

2              I think that may be it with respect to the few issues

3    that I wanted to address with the Court.  I notice that

4    plaintiff all but conceded that the issues before the Court, at

5    least the as-applied challenge, would be mooted by the mayor's

6    agent ruling on their raze permit application.  And I think that

7    that's central to the issue.

8              If in fact tomorrow or next week or before May these

9    issues that are currently before the Court can be mooted by the

10   mayor's agent's decision, then the Court should appropriately

11   abstain from issuing a decision until the District of Columbia

12   has had an opportunity to render a decision on this issue.

13   We're not asking this Court to never adjudicate the claim, as

14   plaintiff suggests, we're simply asking that the Court wait.

15   And it could be a matter of weeks, it could be a matter of days,

16   but we're simply asking that the Court abstain.  We're not

17   asking that federal courts never adjudicate --

18             THE COURT:  So you're not asking me to dismiss?

19             MS. TAYLOR:  I'm asking you -- we've moved to dismiss

20   on ripeness and abstention and exhaustion grounds.  But in

21   response to plaintiff's claim that abstention is not an

22   appropriate doctrine for the Court to consider, because under

23   *Pullman*, that federal courts would never be involved or never

24   adjudicate these claims, that's not what we're asking here.

25             We're asking that the Court wait.  Because the very

1    claims that are before this Court are before the mayor's agent,

2    just like --

3             THE COURT:  No, they're not.  That's -- they're not --

4             MS. TAYLOR:  Actually, Your Honor, they are.  And let

5    me explain why.

6             THE COURT:  I thought --

7             MS. TAYLOR:  Let me explain why.

8             THE COURT:  Oh, okay.  They are going to consider the

9    RFRA claim?

10            MS. TAYLOR:  Well, RLUIPA, RFRA, and First Amendment in

11   this context is inseparable from economic hardship.  It's

12   inseparable.  And if you look at most of the cases that involve

13   churches that seek to renovate, that seek to alter or modify or

14   raze their property, they always allege that there's some

15   financial hardship that they would suffer if they were not able

16   to do what they intended to do.  The mayor's agent -- and

17   plaintiffs claim this is an impossible standard, it's a takings

18   standard.

19            It's not a takings standard, Your Honor.  Under our

20   statutory law, the mayor's agent can consider whether or not the

21   project is in the public's interest, is a project of special

22   merit.  The mayor's agent can also decide whether or not the

23   plaintiff in this case would suffer an economic hardship if

24   their raze permit application is denied.  The very arguments

25   that plaintiffs have made to you, ICG, the financial constraints

1   on their ability to serve their mission, those are the same

2   arguments they made before Harriet Tregoning, the mayor's agent.

3         The heart of this plaintiff's complaint is finances.

4   The affidavit, Your Honor -- if I could just turn to the

5   affidavit, I don't have it in front of me, the affidavit that

6   they submitted in support of this motion to dismiss has nothing

7   to do with religious activity.  It has to do with finances.

8         If you look at -- it's Matthew -- or Mark Mathiesen's

9   affidavit, he talks about the lease agreement between ICG and

10  the church, and how the lease agreement contemplates two

11  possible outcomes, that the land under the church building would

12  be deeded to the church, and the lease agreement would terminate

13  if the landmark -- if the church was designated a historic

14  landmark.  Second, if the church would be demolished, then

15  additional financial resources potentially available to the

16  church would enable it to build a new place of worship at the

17  same location.  Really, the complaint is littered with

18  references to their finances.

19         THE COURT:  Well, of course it's littered --

20         MS. TAYLOR:  He asks --

21         THE COURT:  Ms. Taylor, it's --

22         MS. TAYLOR:  He asks --

23         THE COURT:  Ms. Taylor?

24         MS. TAYLOR:  Yes.

25         THE COURT:  It's littered with references to finances;

1    it's also littered with references to the free exercise of their

2    First Amendment religious choice of the way they wish to

3    worship.

4            MS. TAYLOR:  Well, I think to some extent --

5            THE COURT:  If "littered" is the right word for a claim

6    like that.

7            MS. TAYLOR:  Well, Your Honor, it's clear that with

8    respect to their claims of financial hardship, economic hardship

9    to the church, those are the same claims that were before the

10   mayor's agent.  This Court is entertaining the same claims.

11   We've got two different forums where the same arguments are

12   being made in two different bodies.  So the District of

13   Columbia, through its administrative process, does allow

14   consideration of economic hardship, and that goes to the very

15   heart of the plaintiff's free exercise claim.  So in that

16   regard, they're almost indistinguishable.

17           And I think given that fact, that the Court should

18   certainly abstain from ruling on this issue until we've had an

19   opportunity to issue a decision and order on the plaintiff's

20   raze permit application, taking into consideration the very

21   things that this Court is taking into consideration.

22           THE COURT:  All right.  Well, the only motion that's

23   before me is a motion to dismiss.  The motion asserts, among

24   other things, that historic preservation designation alone

25   imposes no burden, it's only a process.  That argument frankly

1    blinks reality.  It is very clear that a burden is imposed by

2    historic designation; it's a financial burden, it's a burden on

3    the alienability of land, on what you can do with land.

4           And the contrary ruling of the D.C. Court of Appeals,

5    if indeed it is a contrary ruling of the D.C. Court of Appeals

6    in the *Baptist Church* case, A, is not binding on me; B, is

7    distinguishable because in that case nobody ever even filed a

8    request for a variance.  And I decline to follow it.

9           As far as ripeness is concerned, I think the

10   plaintiff's constitutional facial free exercise claim about the

11   designation is ripe.  That doesn't mean I have to decide it now.

12   I think that claim is going to be eclipsed by other claims, and

13   frankly, I don't see the purpose in my cranking out a 100-page

14   constitutional decision on a very complex issue like that when

15   the issue is still before the District of Columbia government

16   for decision.

17          As a practical matter, if not as a fully legal matter,

18   the decision of the District of Columbia government may very

19   well moot most of the concerns that the plaintiffs have.  And I

20   think this Court, any court would be unwise to venture into the

21   constitutional free exercise thicket here if the practical

22   aspects of the case are resolved by administrative action of the

23   D.C. government.

24          I am troubled to hear that the D.C. government declines

25   even to entertain the religious freedom claims of the plaintiffs

1    here, but the invitation to take that to a court of their choice

2    probably will serve just as well.

3            I think the right thing for me to do in this case -- it

4    is now early April.  The District of Columbia is required by law

5    to decide the razing question by whenever 120 days have run

6    after the record was closed in January, which means in May.  I

7    think the right thing to do with this motion to dismiss is

8    simply to deny it, which I hereby do.  The motion to dismiss is

9    denied without further order of the Court, and I'm just going to

10   wait and see what happens next.

11           If there's nothing further, we are adjourned and

12   counsel are excused.  And thank you very much.

13           (Proceedings adjourned at 3:30 p.m.)

1          **CERTIFICATE OF OFFICIAL COURT REPORTER**

2

3          I, Rebecca Stonestreet, certify that the foregoing is a

4    correct transcript from the record of proceedings in the

5    above-entitled matter.

6

7

8

9    _____          _____

10   **SIGNATURE OF COURT REPORTER**                **DATE**

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25