Roman P. Storzer (D.C. Bar 459878)
**STORZER & GREENE, P.L.L.C.**
1025 Connecticut Avenue, N.W., Suite 1000
Washington, D.C. 20036
Phone: (202) 857-9766

George R. Keys, Jr. (D.C. Bar 292722)
**JORDAN & KEYS, P.L.L.C.**
1400 16th Street, N.W., Suite 710
Washington, D.C.  20036
Phone: (202) 483-8300

Eric Rassbach (D.C. Bar 493739)
**THE BECKET FUND FOR RELIGIOUS LIBERTY**
1350 Connecticut Avenue, N.W., Suite 605
Washington, D.C. 20036
Phone: (202) 349-7200

Maude Amelia Myers (D.C. Bar 499448)
c/o Third Church of Christ, Scientist
900 16th Street, N.W.
Washington, D.C.  20006
Phone: (734) 709-7986

*Attorneys for Plaintiff*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

| | |
|---|---|
| THIRD CHURCH OF CHRIST, SCIENTIST, WASHINGTON, D.C., 900 16TH STREET NW, WASHINGTON DC 20006 <br><br> Plaintiff, <br><br> v. <br><br> DISTRICT OF COLUMBIA HISTORIC PRESERVATION REVIEW BOARD, 801 NORTH CAPITOL STREET NE, WASHINGTON, DC 20002, and <br><br> THE DISTRICT OF COLUMBIA, 1350 PENNSYLVANIA AVENUE NW ROOM 310 WASHINGTON DC 20004 and | Civil Action No. 08-01371 (JR) <br><br> **AMENDED COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF AND NOMINAL DAMAGES; AND DEMAND FOR JURY TRIAL; SUMMONS** |

RECEIVED

MAY 2 1 2009

Clerk, U.S. District and
Bankruptcy Courts

1

HARRIET TREGONING, MAYOR'S AGENT
FOR HISTORIC PRESERVATION
2000 14TH STREET, N.W., 4TH FLOOR
WASHINGTON, D.C.  20009

Defendants.

## AMENDED COMPLAINT

Comes now the THIRD CHURCH OF CHRIST, SCIENTIST, WASHINGTON, D.C., by and through its attorneys, pursuant to Fed R. Civ. P.15(a)(1)(A), and for its Amended Complaint states as follows:

## NATURE OF ACTION

1.     The Plaintiff, the Third Church of Christ, Scientist, Washington, D.C. (hereinafter the "Church"), brings this action to redress injuries caused by the Defendant's unlawful restrictions on the Plaintiff's use of its Church building.  The Church's present building, widely criticized as the "most unfriendly and depressing piece of spiritual architecture" in the city, is wholly inadequate to serve the congregation and prevents the Church from engaging in religious activities motivated by its sincere beliefs.  The Church seeks to replace this structure with a place of worship that will accommodate both its congregation and its religious needs.   The Washington, D.C. Historic Preservation Review Board (hereinafter the "HPRB"), however, has designated the 37-year-old building as a historic landmark, preventing the Church from replacing its building and substantially burdening the Church's free exercise of its religion.

2.     Plaintiff alleges that the HPRB's historic landmark designation violates the First Amendment of the United States Constitution, the Religious Land Use and Institutionalized Persons Act of 2000, 42 U.S.C. § 2000cc *et seq.* (hereinafter "RLUIPA"), and the Religious

Freedom Restoration Act, 42 U.S.C. § 2000bb *et seq.* (hereinafter "RFRA"), by substantially burdening the Church's religious exercise without a compelling governmental interest.

2A.     Plaintiff also alleges that the District of Columbia, in a May 12, 2009 decision and order by the Mayor's Agent for Historic Preservation, Harriet Tregoning (hereinafter "Demolition Permit Decision"), has wrongfully defied controlling federal law in a decision granting Plaintiff a demolition permit and placing certain conditions upon such permit.

3.      Plaintiff seeks declaratory and injunctive relief under RLUIPA, RFRA, 42 U.S.C. § 1983 and the United States Constitution for injuries suffered as a result of Defendants' unlawful conduct.  Plaintiff also seeks nominal damages, costs and attorneys fees.

## JURISDICTION AND VENUE

4.      This Court has jurisdiction over all federal claims in the Complaint as arising under the United States Constitution pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3) and (a)(4), and under 42 U.S.C. § 2000cc *et seq.*, which confers original jurisdiction on United States District Courts in suits to redress the deprivation of rights, privileges and immunities, as stated herein.  This Court has jurisdiction over the request for declaratory relief pursuant to 28 U.S.C. §§ 2201 and 2202.

4A.     This Court has supplemental jurisdiction over all District of Columbia law claims arising from Defendants' actions addressed herein under 28 U.S.C. § 1367.

5.      Venue lies in this District pursuant to 28 U.S.C. § 1391.  All Defendants and Plaintiff are located in this District.  All events giving rise to this action occurred in this District.

**PARTIES**

6.      At all times herein mentioned Plaintiff THIRD CHURCH OF CHRIST, SCIENTIST, WASHINGTON, D.C. was and is an incorporated church located in Washington, D.C. The Church has been located at 900 16th Street NW since 1971.

7.      Defendant DISTRICT OF COLUMBIA HISTORIC PRESERVATION REVIEW BOARD is an agency of the District of Columbia government, created and existing by virtue of the laws of the District of Columbia, and is empowered by the District to act through its officials. The HPRB is empowered by the District of Columbia to designate buildings within the District as historic landmarks. D.C. Code § 6-1103(c)(3) (2001 ed.).

8.      Defendant DISTRICT OF COLUMBIA is the Seat of the Government of the United States and a municipality organized under the Constitution and Laws of the United States.

8A.      Defendant HARRIET TREGONING is an employee of the District of Columbia as the Director of the District of Columbia Office of Planning and has been designated as the Mayor's Agent for Historic Preservation, pursuant to D.C. Code § 6-1102(8) (2001 ed.), and it is in such capacity that she is joined in this action as a party defendant.

**STATEMENT OF FACTS**

Third Church of Christ, Scientist and Its Religious Exercise

9.      The Third Church of Christ, Scientist, Washington, D.C., is a religious corporation organized under the laws of the District of Columbia.  It was founded in a house on Lafayette Square in Washington, D.C. in 1918, and has been located within six blocks of its original location during its entire existence.

10.      The Church's first service was held on March 24, 1918. It was incorporated on June 25, 1926.

4

11.     The Church's Mission Statement, which is part of its corporate bylaws, emphasizes the importance of its location:

> This Church ministers to the world of downtown Washington, D.C. and to those for whom the downtown is important to their lives.  It strives to embrace the world of government and business, of hotels and offices, of residents, commuters, visitors, and those who make their home on District streets.  This Church strives to demonstrate that prayer uplifts the health of all aspects of our community, including the health of city families and children, and the health of the government.

(Formally adopted by the Church's members in July 2000, reaffirming a statement of purpose espoused in membership documents as early as 1963).  The Church thus located in this area specifically to cater to the needs of the people of downtown Washington, and moving out of this area would be incompatible with the Church's stated mission.

11A.   In the Demolition Permit Decision, the Defendant District of Columbia's Mayor's Agent found that "[t]hroughout its history, this congregation has manifested an unwavering intent to remain where it is.  Its location is its mission.  To leave the area it has served since 1918 would be tantamount to its destruction."

12.     For many years, the Church was located at 13th and L Streets, NW in the District of Columbia.  In 1967, the Church moved out of its 13th Street location to prepare for building a new home on 16th and Eye Streets, NW.  In 1971, the Church's congregation moved to the subject building.

13.     The subject building was constructed and financed by the membership of the Church on land leased from The First Church of Christ, Scientist, in Boston, Massachusetts (a body corporate in accordance with the laws of the Commonwealth of Massachusetts), pursuant to a Lease Agreement dated November 9, 1972.

14.     As described *infra,* the Church's place of worship was built in the "Brutalist" architectural style (hereinafter the "Brutalist building").  As one commentator has described it, Brutalism is "the celebration of concrete."  The style has been the subject of much criticism:

> Critics argue that th[e] abstract nature of Brutalism makes the style unfriendly and uncommunicative, instead of being integrating and protective, as its proponents intended. For example, the location of the entrance of a Brutalist structure is rarely obvious to the visitor.  Brutalism also is criticized as disregarding the social, historic, and architectural environment of its surroundings, making the introduction of such structures in existing developed areas appear starkly out of place and alien.

The Church's present building suffers from all of these problems.

15.     The designer of the new building, Araldo Cossutta, had never built a church before.  Cossutta had little interaction with church members during the design phase of the building.  When church members complained about the elements of his design, he told them that those elements would have to remain, as they were part of his "artistic vision."

16.     When Cossutta finished the building in 1971, it did not resemble a church.

17.     The building is a concrete octagonal tower.  Its fortress-like façade features three massive, windowless, 60-feet high concrete walls.

18.     The door to the Church is hidden when one approaches the building.  Instead, the door faces a plaza which is cut off from the street and which connects the Church with an office building.

19.     The Church contains a cavernous, disjointed auditorium that seats 400.

20.     The Church does not have a steeple.  Instead, the church bells hang in two racks from a horizontal arm projecting from the side of the building.

21.     The Church has always found the Brutalist building inadequate to house its religious programs and its congregation.  From the start, as Church records demonstrate, in 1965, members wanted a "useful, practical building rather than a prestigious structure." The current structure makes it difficult for the Church to follow the Scriptural foundation of its worship:

> For I was hungered, and ye gave me meat: I was thirsty, and ye gave me drink: I was a stranger, and ye took me in: . . . And the King shall answer and say unto them, Verily I say unto you, Inasmuch as ye have done it unto one of the least of these my brethren, ye have done it unto me.  (Matt. 25:31-46).

Third Church members believe that these verses mandate that their church building be a welcoming place that will attract prospective new members and permit ministering to the community.

22.     Instead, as the U.S. Commission of Fine Arts observed, the Brutalist building resembles a "war time bunker."

23.     The Brutalist building has failed the Church in its mission.   The Church's auditorium was built to accommodate 400 people in a dark, broken-up and unfriendly atmosphere, whereas the Church currently draws approximately 40-60 Sunday worshippers.

24.     There are many facets of the Church's current building that prevent it from expressing its religious message, including:

(a)     The main entrance is hidden from nearly any direction from which one approaches the Brutalist building.  This location conveys the erroneous impression that the Church is not open to strangers or newcomers;

(b)     The massive exterior walls, with no windows or doors on the sides facing the streets and sidewalks, give a forbidding appearance to passersby;

(c)     The plaza terminates in a high, gray, plain, vertical reinforced concrete wall;

(d)     The walkways in the plaza in front of the church, and the plaza design itself, direct eye and foot traffic to the office building across the plaza from the church, and away from the church;

(e)     The cavernous auditorium, which seats 400, is 250 more than needed. It presents a dark, enclosed environment served by only two skylights and one window, which never give enough light to conduct a service, and depending on the time of day and position of the sun, may not provide any light;

(f)     The electric lighting, which fully covers the ceiling and must be used for services, further detracts from a feeling of communion with God.

25.     The Brutalist building is also deteriorating, which has caused a number of additional problems.  Concrete is a porous material which allows water to penetrate its exterior surface.  Water entering the concrete walls of the church has led to (1) poor insulation in the building, causing radical changes of temperature through loss of heat in the winter and loss of cooling in the summer; (2) a smell of dampness in the auditorium; and (3) deterioration and the eventual weakening of the entire structure.  These problems negatively affect the Church's worship and other religious activities.

25A.   Defendant District of Columbia admitted through the Demolition Permit Decision by its Mayor's Agent that "[t]he building suffers from the common deficiencies of mid-20[th] century concrete structures with structural cracking and water infiltration.  In the existing building, the cracking affects every elevation from top to bottom of the structure.  There is

observable "spalling" (the breaking of layers or pieces of concrete from the surface of a structural element) caused by the interaction of infiltrating water and the steel reinforcing rods."

26.    In order to counteract the poor insulation and maintain a comfortable temperature setting, during the summer the building's HVAC systems must operate 24 hours a day, seven days a week.  Even with such usage, temperatures and humidity are often uncomfortable for congregants, staff and visitors.  The constant HVAC usage has resulted in expensive heating and cooling bills and is environmentally irresponsible.  These impacts are not in keeping with the requirements of the governing *Church Manual*, which states, "God requires wisdom, economy, and brotherly love to characterize all the proceedings of the members . . . ." (Article XXIV, Section 5, Manual of The Mother Church, The First Church of Christ, Scientist, in Boston, Massachusetts.

26A.    Defendant District of Columbia admitted through the Demolition Permit Decision by its Mayor's Agent that "[t]he use of uninsulated concrete also resulted in the inability to stabilize the wide range of temperature and humidity levels that exist within the building'" and "the single system requires almost constant operation to maintain tolerable interior conditions in the main auditorium which is used only a small portion of the time."

27.    Congregants and visitors entering the Brutalist building's auditorium experience the feeling of a dark and somber environment.  The lack of natural lighting and the numerous electric lights on the ceiling create the perception of being in an artificially lit auditorium, not an atmosphere conducive to religious worship.   Additionally, the dozens of lights on the two-story-high ceiling requires the Church to set up scaffolding each year simply to replace light bulbs, further interfering with Church worship.

28.    Independent of the negative effects imposed on the Church's religious exercise, the Church seeks to use its funds for the Church's mission, and not for the maintenance of a Brutalist building.

28A.    Defendant District of Columbia's Mayor's Agent found that:

"[e]ven when considering only normal operating costs, the church faces a dire financial situation likely to cause its demise within eight years or less. . . . for example, in 2007, the Applicant's [the church's] income was $225,000 while its expenses were $269,000, including $50,000 for rent (for the ground lease and the reading room lease) and $126,000 for building operations and maintenance."

### Need to Replace the Brutalist Building

29.    Church members were so dissatisfied with the Brutalist building that they began looking for alternatives as early as the 1980s, only ten to fifteen years after it was built. However, the Church never considered moving from its location.  As discussed *supra*, the Church had always resided within 6 blocks of its present location in order to fulfill its mission.

30.    In approximately 1985, the Church began negotiations with developers for redevelopment of the site, including the possible replacement of the Brutalist building.  These plans nearly came to fruition.  In 1991, however, a land-use organization called the "Committee of 100 on the Federal City" (hereinafter "Committee of 100") filed an application to the HPRB to designate the 20-year old Brutalist building a landmark.  As soon as the application was filed, the building became a "prospective landmark."  Plaintiff opposed the application.  In a series of communications, the Church asked that the application be withdrawn, and, initially, the applicants suggested that they would do so if the Plaintiff was opposed to the designation. Despite the Plaintiff's request, the application languished before the HPRB until recently.

31.    In 2005, negotiations began between The First Church of Christ, Scientist, in Boston, Massachusetts (hereinafter "The Mother Church") which owned the land underneath the

Brutalist building as well as the rest of the lot on which the building stands, and ICG 16th Street Associates, LLC, a Delaware limited liability company (hereinafter "ICG"). On January 16, 2007, The Mother Church conveyed its interest in the land, subject to the lease with the Church, to ICG. The 2007 agreement permitted the Church to build an adequate place of worship on the property that would accommodate its congregation and religious exercise. ICG asked the HPRB to finally rule on the application, which had been pending since 1991.

32.     In December of 2007, over Plaintiff's objections that the landmarking would substantially burden its religious exercise, the HPRB designated the Brutalist building a historic landmark to be entered in the District of Columbia Inventory of Historic Sites (see *infra*).

33.     The immediate effect of the HPRB's decision is to force the Church into maintaining a religious stasis, unable to accommodate even its present religious needs.

<u>The HPRB and the Legal Effect of the Landmark Designation</u>

34.     The HPRB derives its power from The National Historic Preservation Act, which was enacted in 1966. It established the right for states and districts to create a Review Board which would have the authority to designate historic landmarks. Subsequently, the District of Columbia passed the District of Columbia Historic Landmark and Historic District Preservation Act of 1978 (hereinafter the "Act"), enabling the formation of the HPRB, and codified as D.C. Code § 6-1101 (2001 ed.). Section 6-1103(c)(3) of the Act gives the HPRB the power to designate historic landmarks, and to enter them into the District of Columbia Inventory of Historic Places, also created by the Act.

35.     The HPRB has broad discretion to designate (or not designate) any structure as a historic landmark. Section 6-1103(c)(2) of the Act gives the HPRB the power to:

Perform the functions and duties of a State Review Board as
set forth in regulations issued pursuant to the National
Historic Preservation Act of 1966.

These regulations were adopted as the Historic Preservation Regulations (hereinafter the
"Regulations") Chapters 25 and 26, 10A DCMR (*Historic Preservation*) September 2002.  The
Regulations give the HPRB full discretion to designate any building as a historic landmark.  10A
DCMR § 106.1.

36.    The Regulations have "criteria" for making the designation, but they are general
and vague, and any building with even mild historic significance could satisfy the discretionary
criteria.  10A DCMR § 201.1.

37.    The Regulations do not permit the HPRB to consider a religious owner's rights
under RLUIPA, RFRA or the First Amendment in making the designation.

38.    During the process of designating the Brutalist building a historic landmark, the
HPRB explicitly refused to consider the Church's rights under RLUIPA, RFRA or the First
Amendment. Tersh Boasberg, the Chairman of the HPRB, stated at its hearing on December 6,
2007 that "the case is not about . . . a violation of the First Amendment or RLUIPA, the
Religious Liberties and Institutionalized Persons Act."   He further stated that "the act of
landmarking itself does not impinge on religious freedom" and "[i]t's not a First Amendment
case."

39.    Chairman Boasberg is also a member of the Committee of 100, the private
organization that filed the application to landmark the Brutalist building back in 1991.

40.    Upon information and belief, Chairman Boasberg was appointed a trustee of the
Committee of 100 in 1993, and in 1996 he became Chairman of the Committee of 100.

41.     Chairman Boasberg did not recuse himself, offer to recuse himself, or mention his past and present relationship with the Committee of 100 during either the landmarking or demolition permit hearings before the HPRB.

42.     The Regulations do not include a minimum age for the designation of any building.  By contrast, the federal rules for the National Register of Historic Places, created by the 1966 National Historic Preservation Act, require that a building be at least 50 years old before it is included in the National Register.

43.     The Act calls for the creation of a 9-member panel that votes on applications for landmark designations.

44.     The Regulations also delineate how the HPRB decides which buildings it will designate as historic landmarks.  Section 203.1 of the Regulations states the following:

> Application for designation of a property as a historic landmark or historic district shall be made only by the owner of the property, the Board, a public agency, governmental unit or department, Advisory Neighborhood Commission, or a historic preservation organization.

This provision allows many different types of organizations or agencies to apply to designate another entity's property as a landmark.  Section 208.2 of the Regulations explains the effect of filing an application with the HPRB:

> When the staff has completed the official filing, the application is considered a pending application, and if the property is a proposed historic landmark, it is protected by the Act.

Thus, the mere filing of an application to create a historic landmark gives the building in question "protected" status.

45.     Sections 203.1 and 208.2 therefore permit virtually any organization to decide that a property should be protected under the Act, and then file an application with the HPRB, thereby automatically preventing certain changes to the property, including demolition.

46.     Here, the Brutalist building's "proposed landmark" status lasted for 16 years, during which time the Church was forced (after the resulting collapse of the 1991 development plans) to pray in and pay for a structure that did not fulfill its religious needs.  The HPRB did not decide on the application until December 2007.

47.     The HPRB's specific purpose in designating the Brutalist building a landmark was to prevent its demolition.

48.     The designation of the Brutalist building as a landmark prevents the Church from making any exterior alterations to the building—including demolition, subdivision, alteration, or even some types of minor repairs—without first obtaining a permit from the HPRB.  D.C. Code §§ 6-1104(a), 6-1105(a) (2001 ed.).

49.     The HPRB meets once a month to decide on permit applications.  It recommends to the District of Columbia's Mayor's Agent whether to deny a permit or to grant it.  If the HPRB decides to recommend granting the permit, it sends the application to the District of Columbia Mayor's Agent, the representative designated by the Mayor to make permit determinations for landmark structures.  If the HPRB decides to recommend denial of the permit, the building owner has the right to request a public hearing before the Mayor's Agent.

50.     Under D.C. Code § 6-1104(e), the Mayor's Agent may issue a demolition permit for a landmark structure if the permit is "necessary in the public interest" or the failure to issue a permit will result in an "unreasonable economic hardship" to the owner.  "In the public interest" means: (i) a project deemed to have "special merit" by virtue of "exemplary architecture, specific

features of land planning, or social or other benefits having a high priority for community services." § 6-1102 (11), D.C. Code (2001); or (ii) a project consistent with the stated purposes of the legislation at § 6-1101(b), D.C. Code (2001).

51.     Under applicable law, the Mayor's Agent does not consider RLUIPA, RFRA, or the First Amendment in his or her analysis.

52.     [DELETED]

53.     In fact, the Church did apply for a demolition permit, and the HPRB unanimously voted on July 24, 2008 to recommend denial of the Church's request to raze the Brutalist building.

54.     The HPRB's recommendation was based solely on the Church's landmarked status.

55.     Chairman Boasberg stated that the HPRB could not consider issues of religious freedom.   He stated that the Church could "challenge the landmarking in any court of your choice."

56.     The Historic Preservation Office (hereinafter the "HPO") enforces the landmark designations of the HPRB.   The HPO conducts property inspections to ensure that no construction takes place on landmarked buildings.  Violators are subject to significant fines and penalties, including a $2,000 civil infraction fine.

57.     The Church cannot raze or modify the exterior of the Brutalist building without being subject to such fines and penalties.

58.     The HPRB's stated interest in designating the Brutalist building as a landmark, as well as the additional hurdles forced upon the Church as part of any futile attempt to do so raze the building, have created a great hardship to the Church.  Not only has the HPRB prevented the

Church from replacing its place of worship, but the inability of the Church to obtain a demolition permit in a timely manner as a matter of right has frustrated the financing mechanism under the 2007 agreement with ICG.  That agreement would enable the Church to continue its existence at the corner of 16th and Eye in a newly designed structure that satisfies its religious mission; it would also enhance the streetscape of the entire block in a manner respectful and complimentary to the 16th Street Historic District and L'Enfant Plan.

58A.   On May 12, 2009, the Defendant District of Columbia's Mayor's Agent issued the Demolition Permit Decision, a copy of which was filed in this case by Defendant District of Columbia as Document 31 on May 13, 2009.

58B.   Defendant District of Columbia's Mayor's Agent acknowledged in the Demolition Permit Decision that Plaintiff asserted its rights under RFRA and RLUIPA during the public hearing before her.

58C.   In the Demolition Permit Decision, the Mayor's Agent held that she would not consider Plaintiff's rights under RFRA, RLUIPA or the First Amendment, saying:

> If the Mayor's Agent cannot consider equitable arguments, it seems evident that the adjudication of constitutional claims is similarly *ultra vires. See, e.g. Liu v. Waters*, 55 F.3d 421, 425 (9th Cir. 1995)(Board of Immigration appeals lacks jurisdiction to decide questions of the constitutionality of the governing statute).  However, in order to permit the [Plaintiff] to preserve the issues for any subsequent appeal, it was permitted to make a record with respect to its constitutional and RFRA/RLUIPA claims. *See, e.g. Appeal No. 17504 of JMM Corporation*, 54 DCR 9871 (2007)(Board of Zoning Adjustment heard, but did not decide an applied takings claim).

58D.   Furthermore, the Demolition Permit Decision conditions the permit issuance upon the issuance of a building permit for another church which is acceptable to Defendants:

> For the reasons stated below, the Mayor's Agent finds that the denial of the permit would result in the inevitable demise of the Third Church as a downtown congregation, and therefore concludes that the Department of Consumer and Regulatory Affairs may consider the demolition permit application cleared for historic preservation purposes. However, as will be explained below, this clearance shall not take effect immediately, but

shall become effective upon the issuance of [sic] building permit to the [Plaintiff] for a replacement church on either the Existing Parcel or "New Church Parcel."

58E.    Having found that the Plaintiff suffered an "undue economic hardship" as a consequence of the historic landmark decision, the Mayor's Agent in the Demolition Permit Decision nonetheless compounds and prolongs that hardship by imposing conditions on the demolition of the church building.

58F.    The effect of the conditions attached to the Demolition Permit Decision is to require that the Plaintiff endure a series of administrative processes subject to the discretionary approval of officials of the Defendant District of Columbia: first, applying to the Zoning Commission of the District of Columbia for a planned unit development approval of a project which will include a new church building in a contested case proceeding under 11 DCMR (*Zoning*) § 2400 *et seq.* (February 2003), then applying for and securing the approval of the Defendant HPRB in a subsequent administrative proceeding under 10A DCMR (*Historic Preservation*) § 300 *et seq.*, because the project is located within the 16th Street Historic District, and finally, developing final construction drawings which can then be submitted to the Department of Consumer and Regulatory Affairs for review and eventual issuance of a building permit. The Mayor's Agent has thus added years, and further major expense, to the ability of the Plaintiff to obtain relief from a burdensome historic landmark decision that she agrees imposes an "undue economic hardship."

59.    The Defendants possess no compelling interest in burdening the Church's religious exercise.

60.    Designation of "historic" buildings is an aesthetic interest, and is not in furtherance of the public health and safety.

60A.   By letter dated November 20, 2008, District of Columbia Advisory Neighborhood Commission 2B voted 9-0 to approve a resolution urging the Mayor's Agent "to rule in favor of the congregation on both hardship and federal civil rights grounds."   The resolution stated that the church structure did not "meet the needs of the congregation in fulfilling its religious mission,  and the congregation makes a compelling case that it actually impedes them," while "maintenance of the Brutalist structure imposes an undue financial burden and hardship upon the congregation."

60B   The Mayor's Agent found that "[t]he building's design and choice of materials, particularly the use of uninsulated concrete, were experimental and it could not have been predicted when the building opened in 1971 whether it would succeed as a place of worship.  As will be explained in the findings that follow the experiment failed badly."

61.   Furthermore, even if a government may possess a compelling interest in preserving some historic structures such as Independence Hall in Philadelphia or the Old Stone House in Georgetown, this interest does not exist for the Church's Brutalist building.

61A.   The Defendants also lack a compelling interest because, as the Mayor's Agent held:

> "[a]lthough the Church's present predicament results from design choices it agreed to, albeit reluctantly, those choices were made in the hope of achieving breakthrough architecture. To force this congregation to live with, and most certainly die as a result of, the failure of its experiment would dissuade others from choosing the novel over the mundane."

62.   At the time the Church's building was erected, many observers expressed distaste for the design. Washington Post architecture critic Wolf von Eckardt, in an article titled "Rude, Brutal, Military, Uncivilized," called it "rude and disorderly, a brutal, uncivilized and

inappropriate intrusion on the approach to the White House." Subsequently, another Washington Post architecture critic, Ben Forgey, criticized it as "brooding, inward-looking."

63.     Significantly, in 1988 the U.S. Commission of Fine Arts stated that "there is little about [the building] that might characterize traditional religious enclosures. It is, after all, an auditorium not a sanctuary . . . . [It has] outstanding problems that are not easily resolved . . . the south side of the church conjures the very unfortunate but obvious image of a war time bunker."

64.     Recently, Washington Post Columnist Marc Fisher called the building "antagonistic to human spirituality" and "an example of a failed and arrogant architectural experiment." He describes it in the following way:

> Two blocks from the White House, there is a concrete fortress that looks like a top-secret government installation. Set back on a barren plaza frequented mainly by homeless men in search of a restroom, the building faces 16th Street NW with dirty, rough, blank walls. Amazingly, this building is a church—probably the city's most unfriendly and depressing piece of spiritual architecture. (Emphasis added.)

65.     Charles Paul Freund, columnist for The American Spectator, commented that "most people probably mistake [the building] for a fortress intended to protect the president's house against a tank assault. It's a largely windowless octagonal tower made of raw, weathered concrete, and it's surrounded by a sterile 'plaza' that seems to have been emptied to keep the line of fire clear."

66.     Architect Thomas L. Kerns wrote to the Historic Preservation Review Board to request that the church not be granted historic landmark status. He wrote, "the Third Church building is more of a static urban sculpture than a vibrant, active building. If we learned our lesson from the failed experiments of Urban Renewals in the 1960s, it is that cities do not benefit

from empty, lifeless spaces and that cities should not force owners to retain places that destroy its character and mission."

67.     Based on the discretionary judgment of a handful of appointed board members—a judgment not even shared by the architectural community at large—the HPRB is now forcing the Church to maintain "the city's most unfriendly and depressing piece of spiritual architecture" at the expense of the Church's religious exercise.

68.     HPRB member Denise Johnson, who voted to landmark the building, said, "You don't necessarily have to like it, but you can learn enough to have an appreciation for it."

69.     The harm to the Church in being forced to maintain the Brutalist building, and to maintain a dysfunctional building until Defendants authorize a new church building, is immediate and severe.

70.     Upon information and belief, the substantial burden imposed upon the Church is imposed in a program or activity that receives Federal financial assistance.

71.     The substantial burden imposed upon the Church affects commerce among the several States.

72.     For the above reasons, the implementation of the HPRB's designation of the Brutalist building as a historic landmark and the Defendant District of Columbia's Mayor's Agent conditioning the demolition permit upon the Defendant District of Columbia's discretionary granting of a new building permit should be enjoined in order to remove the substantial burden such designation places on the Church's religious exercise.

72A.     Furthermore, the Court should issue a mandatory injunction requiring Defendants to consider and enforce RFRA and RLUIPA with respect to any historic preservation actions involving uses of land by religious institutions.

## COUNT I

**Violation of the Religious Land Use and Institutionalized Persons Act of 2000**
**"Substantial Burden on Religious Exercise"**
**(42 U.S.C. § 2000cc(a))**

73.     Paragraphs 1 through 72A are incorporated by reference as if set forth fully herein.

74.     Defendants have deprived and continue to deprive Plaintiff of its right to the free exercise of religion, as secured by the Religious Land Use and Institutionalized Persons Act, by imposing and implementing a land use regulation that places a substantial burden on Plaintiff's religious exercise without a compelling governmental interest, and without using the least restrictive means of achieving any such interest.

## COUNT II

**Violation of the Religious Freedom Restoration Act**
**(42 U.S.C.A § 2000bb)**

75.     Paragraphs 1 through 74 are incorporated by reference as if set forth fully herein.

76.     Defendants have deprived and continues to deprive Plaintiff of its right to the free exercise of religion, as secured by the Religious Freedom Restoration Act, by imposing and implementing a land use regulation that places a substantial burden on Plaintiff's religious exercise without a compelling governmental interest, and without using the least restrictive means of achieving any such interest.

## COUNT III

**Violation of the United States Constitution**
**Free Exercise of Religion: First Amendment**
**(42 U.S.C. § 1983)**

77.     Paragraphs 1 though 76 are incorporated by reference as if set forth fully herein.

78.     Defendants have deprived and continue to deprive Plaintiff of its free exercise of religion, as secured by the First Amendment to the United States Constitution, by substantially burdening Plaintiff's religious exercise without a compelling governmental interest.

### COUNT IV

### Appeal of Defendant Mayor's Agent Decision and Order

79.     Paragraphs 1 though 78 are incorporated by reference as if set forth fully herein.

80.     Plaintiff seeks judicial review of the Decision and Order rendered by Defendant Mayor's Agent in HPA No. 08-141, captioned In the Matter of: Third Church of Christ, Scientist, Washington, D.C., Application for Demolition of Church Building at 900 16th Street, N.W., dated May 12, 2009, on the grounds that the Decision and Order was arbitrary, capricious and contrary to law.

### REQUEST FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court grant the following relief:

(a)     A declaration that the HPRB's action in landmarking the Brutalist building is illegal and unconstitutional on the ground that it places a substantial burden on the Plaintiff's religious exercise without a compelling governmental interest, thereby violating the Free Exercise Clause of the First Amendment to the United States Constitution, the Religious Freedom Restoration Act, and the Religious Land Use and Institutionalized Persons Act of 2000;

(a1)    A declaration that the Defendant District of Columbia's Mayor's Agent' action conditioning the demolition permit upon the issuance of a new building permit is arbitrary, capricious, illegal and unconstitutional on the ground that it places a substantial burden on the Plaintiff's religious exercise without a compelling

governmental interest, thereby violating the Free Exercise Clause of the First Amendment to the United States Constitution, the Religious Freedom Restoration Act and the Religious Land Use and Institutionalized Persons Act of 2000;

(b)   A declaration that the landmarking process in the District of Columbia is illegal and unconstitutional on the ground that it fails to consider or apply the religious liberty protections afforded by the First Amendment, RLUIPA and RFRA;

(c)   A preliminary and permanent injunction ordering Defendants to rescind the landmark designation and preventing Defendant from illegally and unconstitutionally enforcing the Brutalist building's designation as a historic landmark and the conditioning of the demolition permit on the granting of a new building permit, including, but not limited to, enjoining Defendant from applying its laws in a manner that substantially burdens Plaintiff's religious exercise, and enjoining Defendant from preventing Plaintiff's exercise of constitutional and statutory rights;

(d)   A preliminary and permanent injunction requiring the Defendants to consider and apply the First Amendment, RFRA and RLUIPA in future deliberations concerning applications affecting religious assemblies and institutions.

(e)   An award to Plaintiff of full costs and attorney's fees arising from the Defendants' illegal and unconstitutional actions;

(f)   An award of nominal damages; and

(g)   Such other and further relief as this Court may deem just and appropriate.

## DEMAND FOR JURY

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff hereby demands a trial by jury in this action of all issues so triable.

Plaintiff respectfully submitted this 21st day of May, 2009.

By: _George R. Keys_

George R. Keys, Jr. (D.C. Bar 292722)
**JORDAN & KEYS, P.L.L.C.**
1400 16th Street, Northwest
Suite 710
Washington, D.C.  20036
Phone: (202) 483-8300

**STORZER & GREENE, P.L.L.C.**
Roman P. Storzer (D.C. Bar. 459878)
**STORZER & GREENE, P.L.L.C.**
1025 Connecticut Avenue, Northwest
Suite One Thousand
Washington, D.C. 20036
Phone: (202) 857-9766
Fax: (202) 315-3996

Eric Rassbach (D.C. Bar 493739)
**THE BECKET FUND FOR RELIGIOUS
   LIBERTY**
1350 Connecticut Avenue, Northwest
Suite 605
Washington, D.C. 20036
Phone: (202) 349-7200

Maude Amelia Myers (D.C. Bar 499448)
c/o Third Church of Christ, Scientist
900 16th Street, N.W.
Washington, D.C.  20006
Phone: (734) 709-7986

*Attorneys for Plaintiff*